# MARY LAURA BUSEY *v.* CLARENCE W. PERKINS
## ET AL.
### [No. 60, October Term, 1934.]

*Decided January 15th, 1935.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, and SLOAN, JJ.

*Edward H. Burke* and *Daniel B. Leonard,* with whom were *H. Courtenay Jenifer* and *Bowie & Burke* on the brief, for the appellant.

*Burdette B. Webster* and *G. C. A. Anderson,* for the mortgagee trustee, appellee.

*Allan H. Fisher,* with whom were *Fisher & Fisher* on the brief, for Thomas C. Hill, receiver, appellee.

*Walter H. Buck,* submitting on brief, for the Union Trust Company, appellee.

*G. Ridgely Sappington,* submitting on brief, for the Baltimore Trust Company, appellee.

*Mullikin, Sherwood, Stockbridge & Waters,* submitting on brief, for the Baltimore Commercial Bank, appellee.

*Herbert Levy,* submitting on brief, for John J. Ghingher, receiver, appellee.

PARKE, J., delivered the opinion of the Court.

On June 1st, 1929, two sisters, Ida Grace Parrish, widow, and Mary Laura Busey, widow, executed a mortgage deed of real and leasehold property to Clarence W. Perkins, trustee, to secure equally the payment of an aggregate sum of $87,027, for which the mortgagors were liable as the makers or indorsers of notes to divers individuals and corporations. In consideration of the execution of the mortgage deed, the mortgage creditors agreed to postpone the time of payment of the obligations secured for the period of one year accounting from June 1st, 1929, within which period the mortgagors agreed to pay the mortgage debts, with interest thereon payable semi-annually. By the terms of the mortgage, the trustee had the power to release any of the property, granted and conveyed by the mortgage deed, at any time during the existence of the mortgage lien, for the purpose of selling such property at a purchase price whose sufficiency was to be determined by the trustee. The proceeds of any sale so made were to be applied *pro rata* to the payment of the mortgage debts. The mortgage stipulated that, upon the assignment, transfer, or mortgage sale of the mortgaged property, without the consent in writing of the mortgage trustee being first had, the mortgage trustee, at his option, could declare the debts due and payable, and, unless paid, could foreclose. Aside from these special provisions, the mortgage deed contained the usual provisions and covenants, including one prescribing the trustee's commissions, in the event of sale, to be those usually allowed to trustees for making sale of property by virtue of a decree in chancery.

On the day of the execution of the mortgage deed, and in pursuance of an alleged agreement of all the parties in interest, the trustee in the mortgage deed, and the

creditors secured by it, entered into an indenture which recited the execution of the mortgage deed of trust, its essential provisions, and the grantee's acceptance of the trust created, and then provided that the trustee might mark, within five days and for the purpose of identification, the evidences of indebtedness held by the mortgage creditors and intended to be secured; that the trustee would make every effort, during the existence of the mortgage, to sell advantageously, at either public or private sale, sufficient of the mortgaged property to pay the mortgage indebtedness, but, upon the contingency that the mortgage claim should not be so discharged by June 1st, 1930, the trustee would then foreclose the mortgage deed; and that, if the trustee should release any of the mortgaged property, it would only be when the price paid would be fair and just, and the property remaining subject to the mortgage lien sufficient to protect the obligations due the mortgage creditors. A third contemporaneous and complementary document was a power of sale given by the two mortgagors to their solicitor, empowering him to sell their property during the period of one year, and to be paid the usual commission for his services.

The mortgage indebtedness was not paid, and on January 16th, 1934, the trustee began foreclosure proceedings in the Circuit Court of Baltimore City, where a decree of foreclosure was obtained for a sale of the mortgaged premises in that city pursuant to the statute, by reason of the assent having been declared by the mortgagors in the mortgage deed. Public Local Code (Flack) vol. 1, title Baltimore City, art. 4, secs. 720-724. On January 30th, 1934, Mary Laura Busey, one of the mortgagors, filed a petition in the foreclosure proceedings against the trustee and the other mortgagor, Ida Grace Parrish, praying that the mortgage deed of herself and her sister should be annulled on the grounds of fraud and mistake; that the trustee be restrained from foreclosing and exercising any of the powers granted; that the decree of foreclosure be rescinded; that an interlocutory injunction be granted to prevent any further pro-

ceedings by the trustee under the decree; and that the petitioner have other and further relief. Ida Grace Parrish, co-mortgagor, filed an answer which admitted the allegations of the petition, and prayed that the mortgage be set aside and that she be accorded the same relief that had been asked by her co-mortgagor. The trustee filed an answer in denial of the material allegations of the petition. Five of the corporate creditors intervened and answered, and four combined demurrers with their answers. The cause then being at issue, testimony was taken before the chancellor, who, after a hearing, passed a decree dismissing the petition of Mary Laura Busey. The appeal is from this decree.

The petitioner, Mary Laura Busey, is the widow of J. Clarence Busey, who died in 1889. She is the sister of Ida Grace Parrish, whose husband, Edward M. Parrish, died on April 21st, 1929. The sisters are children of John Waters, who died in 1916, and Mary E. Waters, his wife, who died in 1917. Their father had his residence in Baltimore County, where the two sisters lived during the lives of their parents, and have since continued to live. Upon the death of their parents, the two sisters became the owners as tenants in common of valuable real and leasehold property and of various securities. Each sister continued to hold this real and personal property in undivided one-half interests. With the exception of some furniture and her personal effects of little value, the petitioner had no other property.

Soon after the death of Edward M. Parrish, his widow requested Clarence W. Perkins, an attorney at law, to settle her husband's estate. The attorney reported the estate to be insolvent, with an indebtedness of $129,353.-99, that was chiefly held by banks. On this indebtedness, the petitioner, who had signed for accommodation, was an indorser, or maker, in varying amounts, for the aggregate sum of $15,892; and Mrs. Parrish was similarly bound in the amount of $73,867. A number of the notes contained a power for the entry of judgment by confession, and, within one week after the death of Parrish, a

judgment by confession had been entered against Mrs. Parrish, which was quickly followed by another. The maturities of many of the notes were near at hand, while all would become due by the end of August, 1929. It was known that no substantial amount would be received from the greatly insolvent estate of Parrish, and that practically all of the burden of the heavy obligations for which his wife and her sister had become responsible must be speedily met. The real and leasehold property of the sisters in the city was unincumbered, but the land in Baltimore County was subject to an overdue first mortgage lien of $5,000, which was held by the Savings Bank of Baltimore, and which had been on the land at the death of their father. Mrs. Busey had sufficient resources to meet her separate obligations, but her sister was unable to procure $73,867 to satisfy her creditors. Practically all of the assets of the sisters, except the deposits in bank, were not liquid, as these consisted of real and leasehold property, and a mortgage lien of $26,000 on land which they had sold. The property conveyed by the mortgage deed of trust of June 1st, 1929, was appraised as of that date by real estate experts who valued the tract of 370 acres in the county at $315,350, and that in the city at $37,125. While the land in the county was valuable, it did not have a ready market and, therefore, time was required for its disposal.

The financial situation, therefore, was that, while Mrs. Busey could meet her individual liabilities, Mrs. Parrish could not, and Mrs. Busey did not have sufficient available assets to pay the obligations of both. However, if the two sisters should give a mortgage on all the real and leasehold property which they held as tenants in common, all the creditors of each sister would be secured. This security was demanded by the creditors as the price of their forbearance to press the immediate collection of their obligations by suit, judgment, and execution. If Mrs. Busey satisfied the demands against her, and left Mrs. Parrish to meet her own very much greater debt, the creditors of the latter would have secured judgments,

upon which writs of execution would issue against the undivided one-half interest of Mrs. Parrish in the real and personal property of which the two sisters were seised and possessed as tenants in common. The effect of such a course would have been a reduction in the sale value of the undivided moiety of property held by Mrs. Busey, and the passage of the undivided one-half interest of Mrs. Parrish to the purchasers at the execution sales, who would have then become the cotenants of Mrs. Busey. The only methods of terminating such an objectionable status would have been a sale by agreement of all the parties in interest, or a sale for the purpose of partition, if the property were not susceptible of division in kind. Under these circumstances, the interest of each sister was not in conflict with that of the other, except in regard to the disparity of indebtedness. This conflict, however, was resolved by the determination of the devoted sisters to act in concert through the employment of a common solicitor, and, after a full understanding of their relative rights and obligations, to dedicate the property that they held as tenants in common to the payment of the demands for which each was liable, without immediate reference to the inequality in their obligations. A solicitor may represent two clients who desire the same result, although their interests vary in degree. The solution of their problems, which, as had been seen, had much in common, was left to the judgment of their solicitor. His solution of the problems was, therefore, their solution, without reference to whether it was provident or wise, provided he acted with an adequate degree of competency in the exercise of his best judgment, and with the highest degree of honor, integrity, and fidelity to his clients' interests. *Mechem on Agency* (2nd Ed.) secs. 2188, 2192-2195.

There is no testimony, in this cause, of an absence of a reasonable degree of professional learning, skill, and experience on the part of the solicitor, nor a failure to exercise them according to his best judgment. The primary objectives were to obtain delay and unity of action

on the part of the creditors. Delay was desired and required in order to obtain time and, so, opportunity for the debtors to convert the real and leasehold property by bargain and sale, and thereby avoid the disadvantage of a peremptory liquidation; and unity of action by the creditors was indispensable to procure the delay, and to reduce to a single demand the several claims of various creditors, so that, on default of their payment within the period of delay, their claims could be cheaply and simultaneously enforced in a single proceeding in equity. The mortgage given by the sisters to the trustee for the benefit of the creditors attained these objectives. Furthermore, at the time of its negotiation and execution, the value attributed to the property mortgaged was so greatly in excess of the prior mortgage lien, and the one then newly created, that, after the payment of all demands of creditors, there was a contemplated residue of such an amount as apparently to assure such a distribution of the residue as would adjust and rectify the excess of indebtedness under the mortgage which had been assumed by Mrs. Busey for the benefit of Mrs. Parrish. There is, accordingly, nothing in the mode nor the plan adopted that involves any neglect or breach of professional duty by the solicitor, and a careful and complete review of all the testimony has convinced the court that the mortgagors authorized the plan adopted, and executed the documents required for its consummation, with a full understanding of their contents, of the nature and purpose of their acts, and of what was designed to be accomplished by the instruments they signed. The solicitor is not an assurer of the result of his judgment, unless he made a special contract for that purpose, and there is nothing in this record to charge him with the responsibility of a special contract to the effect that the contemplated sales within a year would yield an expected result. *Watson v. Calvert Bldg. etc. Assn.*, 91 Md. 25, 33, 45 A. 879; *Hayne v. Rhodes*, 8 Q. B. 342, 115 Eng. Reprint, 905.

It has been shown that the two sisters were not adverse nor their respective interests hostile, and the testimony on the record does not sustain the contention of the petitioner that the solicitor here represented interests in conflict with those of the two sisters. There is no proof that he was the attorney of any of the parties except the two sisters, nor that he was employed by any interests adverse to his two clients, or at variance with his performance of his duties to them. His contacts with the creditors were all in the behalf of his clients. It was necessary to carry on negotiations with the creditors to obtain the most favorable terms, and to ascertain what they were; and the ultimate outcome of these negotiations was written documents which expressed the contract of the parties and were prepared by the solicitor of the sisters. These documents were consistent with the terms of the mortgage. The solicitor was made the trustee under the mortgage upon the insistence of the mortgagors, and the yielded acquiescence of the creditors. He was further authorized by their duly subscribed, witnessed, and acknowledged instrument of writing to sell, during the ensuing year, any portion of the mortgaged premises. The commission provided in both instances were the usual ones for the services to be rendered. The fact that their solicitor was to be paid an agreed and fair compensation for services to be performed at their request does not render voidable the instruments whereby the parties, with full comprehension of the nature and effect of their acts, nominated the solicitor as the trustee under the mortgage deed of trust, and as their agent to sell under their contract in writing. *Carroll v. Smith,* 99 Md. 653, 658, 59 A. 131; *Brown v. Mercantile Trust Co.,* 87 Md. 377, 392, 40 A. 256. If this were not true, the conveyance of land to a trustee in order to secure the payment of a debt of the mortgagor to his creditor could be avoided as fraudulent, if the mortgagor had first exacted of the creditor that the mortgagor's solicitor be named as the trustee for the purposes of the mortgage deed, and the grant, upon the creditor's acquiescence, had

been made to the solicitor as trustee. *Gaither v. Tolson,* 84 Md. 637, 639, 36 A. 449; *Lawall v. Groman,* 180 Pa. 532, 37 A. 98. Every possible interest the solicitor may have had in the subject-matter was disclosed in writing to the sisters, and by no possible construction could the solicitor's interests be regarded as adverse to them, who, under the circumstances stated, had designated him as their choice for the positions he assumed. *Mechem on Agency* (2nd Ed.) secs. 2189, 2190.

The expectations of the mortgagors that a sufficient sum would be realized by the sales of portions of the mortgaged property through the efforts of their solicitor during the year before the maturity of the mortgage debts were disappointed by the loss of demand for such property by reason of the development of an economic depression; and the mortgagors could not meet their obligations when the mortgage debts came due. The trustee, however, had procured the payment of the interest due to June 1st, 1930, and of $7,917.50 on account of the principal, so that the mortgage was reduced to $79,109.50, and the creditor beneficiaries under the mortgage deed of trust agreed in writing on July 1st, 1930, to extend the time for the payment of the mortgage indebtedness to June 1st, 1931. This extension expired with the mortgage debt still in default. The creditors permitted the foreclosure to be postponed, and no steps to enforce the mortgage lien were taken until January 16th, 1934, when the foreclosure proceedings were begun. Meanwhile, in March, 1932, the two sisters executed, at the foot of the original power of sale to the solicitor, a writing by which they agreed, over their signatures, to continue the power of sale granted to the solicitor on June 1st, 1929, until the mortgage deed was duly released. The continued default of the mortgagors had compelled the mortgage creditors to advance money for interest, taxes, and other purposes and, consequently, on April 11th, 1932, the two sisters again executed and delivered to their solicitor as trustee a second mortgage granting the same property conveyed in their first mortgage to

said trustee to secure a total of $4,374.47 so advanced; and on September 8th, 1932, a third mortgage was similarly given to the said trustee for like advances made in the total of $4,161.40.

The direct, positive, and contemporaneous documentary evidence on this record, which is fortified by the circumstances, and is consistent with the testimony on the part of the defendants, is too convincing to be overcome by the testimony on the part of the petitioner. The court has not attempted a complete statement and an analysis in this opinion of the voluminous testimony on the record, but has stated the case as it has found the facts to have been established by the evidence. Since the court has determined that the petitioner has failed in her proof of fraud or mistake in the execution of the mortgage deed of trust, the decree will be affirmed.

*Decree affirmed, with costs.*