## WOODDY *v.* MUDD

[No. 389, September Term, 1969.]

*Decided May 13, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Edward J. Skeens* for appellant.

*Charles E. Channing, Jr.,* with whom were *James P. Salmon* and *Sasscer, Clagett, Powers & Channing* and *M. Wayne Munday* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

The appellant, Louise Rossiter Wooddy, sued her former attorney alleging "breach of professional ethics, malpractice, negligence, [and] conflict of interest". A jury returned a verdict in favor of the attorney, F. DeSales Mudd, the appellee.

Mrs. Wooddy in her appeal raises a number of questions which we shall not be obliged to answer for in *Rippon v. Mercantile-Safe Dep.,* 213 Md. 215, 131 A. 2d 695

(1957), Judge (later Chief Judge) Prescott said for this Court:

> "[T]his Court has frequently held that in the interest of the orderly administration of justice and to avoid useless expense to litigants, it is the policy of this Court not to reverse for harmless error, and the burden is on the appellant in all cases to show prejudice as well as error. *Sieland v. Gallo,* 194 Md. 282, 71 A. 2d 45; *Balto. Transit Co. v. Castranda,* 194 Md. 421, 71 A. 2d 442." *Id.* at 222.

A motion for a directed verdict was filed on behalf of Mudd at the end of all of the evidence. The trial judge (Bowen, J.) reserved decision pursuant to Maryland Rule 552 c. After the jury's verdict he announced that were he to rule he would have granted the motion. We conclude that this motion should have been granted. Accordingly, if there is error on any of the points raised, it is not prejudicial error. We, therefore, shall affirm the judgment of the trial court and it becomes necessary to discuss only the issues presented by that motion.

In *Maryland Casualty Co. v. Price,* 231 F. 397 (4th Cir. 1916), it is said:

> "In a suit against an attorney for negligence, the plaintiff must prove three things in order to recover: (1) The attorney's employment; (2) his neglect of a reasonable duty; and (3) that such negligence resulted in and was the proximate cause of loss to the client." *Id.* at 401.

This statement has been quoted by many authorities and was quoted by this Court in *Kendall v. Rogers,* 181 Md. 606, 611-612, 31 A. 2d 312 (1943).

In *Niosi v. Aiello,* 69 A. 2d 57 (Mun. Ct. App. D. C. 1949), the court said:

> "The rule to be applied in a case where an attorney is accused of negligence in the conduct

of litigation is that such attorney is not liable for negligence if, notwithstanding the negligence, the client had no cause of action or meritorious defense as the case may be; or that if conduct of an attorney with respect to litigation results in no damage to his client the attorney is not liable. Unless a party has a good cause of action against the party proposed to be sued, the first party loses nothing by the conduct of his attorney even though the latter were guilty of gross negligence." *Id.* at 60.

The court then went on to quote from *Maryland Casualty Co. v. Price, supra,* describing the portion of the opinion quoted above as a succinct statement of the rule. See also *Oda v. Highway Insurance Company,* 44 Ill.App.2d 235, 194 N.E.2d 489, 497 (1963); *Getchell & Martin Lumber & Mfg. Co. v. Employers' Liability Assur. Corp., Ltd.,* 117 Iowa 180, 90 N. W. 616, 62 L.R.A. 617 (1902); *McLellan v. Fuller,* 226 Mass. 374, 115 N. E. 481 (1917); Annot.: 45 A.L.R.2d 5 (1956), entitled "Attorney's liability for negligence in preparing or conducting litigation", §§ 5-8; 7 Am.Jur.2d *Attorneys at Law,* § 188 (1963); 7 C.J.S. *Attorney and Client,* § 146 (1937); and 2 Poe, *Pleading and Practice* (Tiffany's Ed. 1925), § 30. The latter states:

"For any misconduct of attorneys by which pecuniary injury is occasioned to clients, they are responsible in a civil action for damages commensurate to the injury, and they are liable also for the want of such skill, care and diligence as men of the legal profession commonly possess and exercise in such matters of professional employment; but for errors of judgment honestly committed they are not liable, even though such errors be attended with loss to the client. Their undertaking is that they will well and faithfully, with reasonable diligence, and to the best of their skill and ability, perform their duty;

and their civil liability is accordingly restricted to cases of fraud, negligence and positive misconduct."

See also §§ 31-32 and *Cochrane v. Little,* 71 Md. 323, 331-332, 18 A. 698 (1889).

With that background of the law, we turn to the facts. Unfortunate disagreements had arisen between Mrs. Wooddy and her husband, Dr. Arthur Overton Wooddy.[1] Mrs. Wooddy retained Mr. Mudd to represent her. Dr. and Mrs. Wooddy had been living apart under the same roof for some time prior to the time Mrs. Wooddy first consulted Mr. Mudd in February of 1965. When efforts to reach a settlement between the parties failed, Mr. Mudd filed a bill of complaint on behalf of Mrs. Wooddy based upon constructive desertion by virtue of her husband's alleged physical abuse. This was filed on June 28, 1965. The husband countered with a cross bill on his own behalf based upon desertion. After trial a decree was passed on October 18, 1966, granting the husband a divorce *a vinculo matrimonii* from the wife on the ground of her desertion.

Stripped of all the excess verbiage, which in another setting might be called "salesman's 'puffing' ", the contentions of Mrs. Wooddy may be summarized as four in number, namely (1) the divorce suit should have been on the ground of adultery and Mr. Mudd was negligent in not bringing the action on that ground; (2) Mr. Mudd negligently examined title to the Jarwood Clinic property and negligently advised Mrs. Wooddy that she and Dr. Wooddy owned an undivided one-half interest in the property as tenants by the entireties when the half interest was in fact owned solely by Dr. Wooddy, the contention being that if Mrs. Wooddy had known this the divorce action would have been based upon adultery; (3) there was a conflict of interest in that Mr. Mudd was chairman of the advisory board and attorney for the La Plata

---

1. See *Wooddy v. Wooddy,* 256 Md. 440, 261 A. 2d 486 (1970), and *Wooddy v. Wooddy,* 258 Md. 224, 265 A.2d 467 (1970).

branch of Maryland National Bank and while so connected permitted Mrs. Wooddy to sign papers by which a small part of the Jarwood Clinic property was conveyed to a corporation which in turn leased to Maryland National Bank, Mrs. Wooddy receiving one-fourth of the stock of the corporation; and (4) Mr. Mudd was guilty of a conflict of interest in that he executed an affidavit as to the bona fides of the consideration as agent for Suburban Trust Company in a $360,000.00 deed of trust from corporations in which Dr. and Mrs. Wooddy had an interest and at the same time advised Mrs. Wooddy to personally endorse a note pursuant to the original loan commitment. It was contended that the latter two transactions should have been used to effectuate a desired settlement.

We shall examine each of the contentions of Mrs. Wooddy reciting such additional facts as may be necessary. All of the facts are examined bearing in mind that the evidence and all logical and reasonable inferences deducible therefrom must be considered in a light most favorable to the appellant. *Ackerhalt v. Hanline Brothers,* 253 Md. 13, 14, 252 A. 2d 1 (1969).

## DIVORCE ACTION

The evidence presented by Mrs. Wooddy as to the negligence of Mr. Mudd in not bringing a divorce action on the ground of adultery fell far short of establishing that there was a sound basis for charging Dr. Wooddy with adultery.

Under the provisions of Code (1965 Repl. Vol.), Art. 35, § 9 Mr. Mudd was called as an adverse witness. Mrs. Wooddy was bound by his testimony unless it was contradicted. *Lusby v. Nethken,* 256 Md. 469, 476, 260 A. 2d 640 (1970) ; *First Nat'l Realty v. S.R.C.,* 255 Md. 605, 615-16, 258 A. 2d 419 (1969) ; *Larsen v. Romeo,* 254 Md. 220, 225, 255 A. 2d 387 (1969) ; and *Williams v. Wheeler,* 252 Md. 75, 249 A. 2d 104 (1969).

Mr. Mudd said, "Well, I informed her, I am sure, that on the basis of the facts she gave me, the only ground she had was constructive desertion." He went on to say

that he "thought that she had a fair chance of obtaining a divorce", and that he was instructed to endeavor to obtain a property settlement agreement, along with a conversion of the separation into a voluntary separation which would create a ground for divorce 18 months later. He said that he attempted to do this up to the time the suit was filed and "even after the suit", he "guess[ed]".

In the trial of this case three women were mentioned with whom Dr. Wooddy was alleged to have been involved. With reference to one, Mrs. Wooddy admitted that she had no evidence other than Dr. Wooddy's admission. On cross-examination she said relative to that woman, "[I]t was a known fact between Mr. Mudd and myself that this was something that we probably would not be able to prove." Mr. Mudd testified that when this woman's name was presented to him he immediately took the deposition of Dr. Wooddy. There came into this record Dr. Wooddy's statement at the deposition that he at no time ever had had sexual intercourse with a woman other than his wife and that he had not informed his wife that he had committed adultery with any woman.

The second woman named was a hospital technician who occupied an apartment in the same apartment house in which Dr. Wooddy resided after he moved out of the Wooddy home. Testimony relative to this young lady came solely through Mr. Mudd. It was alleged that Mrs. Wooddy repeated to him that the then seven-year-old son of Dr. and Mrs. Wooddy had reported to his mother that when he visited with his father Dr. Wooddy and this young lady had one or more meals together. According to the testimony, Dr. Wooddy moved into this apartment house in September of 1965. Mr. Mudd said that Mrs. Wooddy's complaint to him was that this was an unwholesome atmosphere for the young boy. He called counsel for Dr. Wooddy and registered a complaint. He was met with the explanation that the doctor was on call at the hospital, that Mrs. Wooddy knew this fact, and when the child was with him Dr. Wooddy thought it was his responsibility to have somebody aware of the boy's presence if

he were called out for an emergency. When pushed further on the matter Mr. Mudd said it was his position, "that all ladies are respectable until [he had] information to the contrary. And the fact that they had breakfast together, father and son and a neighbor, wasn't any evidence of an affair." He further said that Mrs. Wooddy at no time asked him to file suit based on adultery. Upon being questioned further on this he said:

> "Well, if she did I don't recollect that she did. If she did I'd say, 'Well, we have got to have some basis for this before we file.' I would not allow a client to make affidavit to a charge such as that without some foundation."

In response to a suggestion by way of a question from Mrs. Wooddy's attorney that Mr. Mudd should have had his own office check on the allegations of adultery, Mr. Mudd said:

> "Well, I may be wrong, Mr. Skeens, but we do not have a law practice where we go around having lawyers or members of the firm peep in bedroom windows and try to manufacture cases, no."

There was an intimation that a young man who was a part time employee of the motel in which Dr. and Mrs. Wooddy had an interest had claimed to have seen Dr. Wooddy and a third woman each enter the same motel room, leaving several hours later in their respective cars. When called as a defense witness this young man unequivocally denied that he ever at any time had seen the woman in question and Dr. Wooddy in a motel room or that he had ever told Mr. Mudd (as claimed by Mrs. Wooddy) that he had seen them together. The woman in question was called as a witness by Mrs. Wooddy. She testified that she was an employee of a nearby hospital, that she had known Dr. Wooddy for about 18 years, and that she had been to Dr. Wooddy's motel room on occasions when she had called ahead and either had taken his

mail to him or had taken his car to him. On cross-examination Mrs. Wooddy admitted that she at no time talked with Mr. Mudd about any adulterous activity between Dr. Wooddy and this woman.

The evidence we have recited constitutes all of the evidence presented in the trial court on the issue of adultery. Mr. Mudd's testimony was not contradicted. It thus will be seen that there was presented to the trial court no reasonable basis upon which Mr. Mudd could be charged with negligence for not proceeding with divorce on the grounds of adultery. Fundamentally, the matter came down to one of judgment, well illustrated by the reply of Mr. Mudd to a question as to whether he had mentioned to Mrs. Wooddy the possibility of injury to the doctor's reputation, his leaving the area, etc., the record on reply being:

> "Many times, not by way of dissuading her from filing for divorce, but by way of explaining to her that even if the information and proof of adultery was available, she might not want to use it; and more particularly, that if she did file for divorce on the grounds of adultery, and there were facts to support it, that it could result in her losing a breadwinner for her children.

> "As a matter of fact, Mrs. Wooddy's explanation to me over a period of a couple of years of Dr. Wooddy's conduct encouraged me to believe that he was an unpredictable man. She and other people told me he'd threatened suicide, she told me that he'd been absent and unaccounted for one time, I think about ten days; had to send the police out to try to locate him.

> "He threatened to join the Peace Corps, and I did tell her that a man in the Peace Corps, Medical man or not, I didn't think could afford to pay substantial alimony or support for his children.

"And all of that, Mr. Skeens, was in an effort, as feeble as it may have been, on my part to try to assuage the grief and the frustration and the problems of this good woman who had a husband that was doing everything in the world, I thought he could, and that was the reason for the divorce, to harass and irritate his wife.

"My whole pitch in the divorce case was that here was an attractive, gentle, genteel woman, she was not a scrub woman, she was a gentle, genteel, educated, refined woman; and that this conduct, even though it was short of adultery, was certainly harassing and cruelty to her. And I had a case to support that.

"And, for instance, I think it's a sin that cries to Heaven for vengeance for a professional man like Dr. Wooddy to tell this woman that he's going to stand by and watch her disintegrate and lose her mind, and put her in a mental institution, and that is what he said. That's what she said he said, and we proved it in Court by her.

"I think it's a sin that cries to Heaven for vengeance for a doctor to know that this woman delivered a Mongoloid child, be told that by the delivering doctor, and then leave her take the child to a pediatrician and let her find out alone.

"Q. Take the child to a pediatrician? A. She did that alone. I think that's about as heartless and unconscionable thing that I think a man and a father and a husband can do, and we proved that in the case."

We see no evidence of negligence on the part of Mr. Mudd in the conduct of the litigation.

## JARWOOD CLINIC

Mrs. Wooddy dwelt at length upon the alleged negligence of Mr. Mudd in searching title to the Jarwood Clinic property. It is apparent that all parties in the divorce litigation and their counsel were under the impression

that Dr. and Mrs. Wooddy owned as tenants by the entireties an undivided one-half interest in this property. In conversations relative to a property settlement, Mr. Mudd relied upon the information communicated to him by his client. As a matter of fact Dr. Wooddy owned an undivided one-half interest and the only interest of Mrs. Wooddy was her inchoate right of dower. Mr. Mudd was not retained to search title to that property. He testified, without contradiction, that his title searching relative to the Jarwood Clinic property, made at Mrs. Wooddy's request, was to ascertain whether there were any outstanding mortgages against it. If Mrs. Wooddy had asked Mr. Mudd to ascertain whether she and Dr. Wooddy owned as tenants by the entireties an undivided one-half interest in the Jarwood Clinic property and if Mr. Mudd had mistakenly advised her that the one-half interest was held by them as tenants by the entireties, that could not have altered the outcome of the divorce litigation. It does not follow that this change in the information as to ownership of property would have been a proper basis for changing the bill of complaint in the divorce case, particularly when it does not appear that evidence to establish adultery was available.

Although the property situation could have had no bearing on the issue of divorce, it would have had a bearing on the amount of alimony, but Mrs. Wooddy was not awarded alimony because it was found that she was not entitled to a divorce.

Mrs. Wooddy has suffered no loss caused by the negligence of her attorney. His actions did not change by one iota the nature of her interest in that property.

THE LEASE FROM J. & W., INC. TO MD. NAT'L BANK

A part of the Jarwood Clinic property was conveyed to a new corporation, J. & W., Inc. This land had been producing no income. Since the parties were under the impression that Dr. and Mrs. Wooddy owned an undivided one-half interest in the Jarwood Clinic property, Mrs. Wooddy received one-fourth of the stock in that corpo-

ration. Mr. Mudd did not set up the corporation, prepare the deed to it, or handle the stock issuance. A long-term lease was entered into between J. & W., Inc. and Maryland National Bank. It is this transaction to which reference is made in Mrs. Wooddy's declaration when she speaks of Mr. Mudd's being "a Director, or officer or stockholder of the Maryland National Bank".

It is undisputed that Mr. Mudd was at that time chairman of the advisory board of the branch of Maryland National Bank at La Plata and local counsel for that bank. Counsel for Mrs. Wooddy read into the record at the trial Canon 6 of the Canons of Professional Ethics adopted by the Maryland State Bar Association as follows:

> "It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel.
>
> "It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.
>
> "The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed."

It seems a little difficult to believe that a sophisticated member of the community such as Mrs. Wooddy, in a town with a 1960 population of 1214, would not have known Mr. Mudd was chairman of the Maryland National

Bank advisory board in that town and its local attorney. The record indicates that Mr. Mudd had no connection with the negotiation of the lease and that Maryland National was represented in the matter by a prominent attorney from Baltimore. Mr. Mudd characterized the transaction from Mrs. Wooddy's standpoint "as a Santa Claus deal". It is apparent that the other parties to the transaction thought the matter was a good business venture. No action on the part of Mr. Mudd has adversely affected Mrs. Wooddy. She claims he might have used this transaction as a club to effect a desired settlement with Dr. Wooddy, which becomes a question of judgment, not a violation of legal ethics. This contention overlooks the fact that she in effect received "something for nothing". The loss, if there were any loss, was on the part of Dr. Wooddy when Mrs. Wooddy received stock in the corporation under the belief that she had an interest in the real estate when she really had only an inchoate right of dower.

## THE SUBURBAN TRUST LOAN

Dr. and Mrs. Wooddy had an interest in several corporations in the Charles County area, including a motel and restaurant. In September of 1964 a commitment was obtained from Suburban Trust Company for a loan in the amount of $360,000.00 to be used for construction of an addition to the motel and to pay off all preexisting loans on the properties to be included in the deed of trust. A condition of the commitment was that the individual stockholders and their spouses were to personally guarantee payment. It is to be noted that this commitment was some months prior to the time that Mrs. Wooddy retained Mr. Mudd to represent her in February of 1965.

Mr. Mudd was retained by the corporations to do certain work relative to the loan. The loan settlement took place on June 10, 1965, a few days prior to the filing of the bill of complaint in the divorce case. The deed of trust and note were prepared by Prince George's County attorneys who were paid a fee of $500.00 from the loan proceeds for their preparation. Mr. Mudd testified that

he did not represent Suburban Trust Company. He represented the borrowers, the corporations in which Mrs. Wooddy held a one-sixth interest. Mr. Mudd executed the affidavit as to the bona fides of the consideration as agent for Suburban Trust Company, settlement having been effected in his office and the loan proceeds having passed through his trust account. It is Mrs. Wooddy's contention that this gave rise to a conflict of interest and that this is evidence of the fact that he was representing Suburban Trust. She further contends he was guilty of a conflict of interest because he represented the corporations in which Dr. Wooddy as well as Mrs. Wooddy had an interest. Her version of the signing is:

"Well I believe it was in the morning [June 10] that Mr. Mudd called me. This was the first I had heard of it. Mr. Mudd called me on the phone and said that he had a mortgage down at his office that needed my signature, and I said, 'For what?'

"He said, 'A signature for the mortgage with the Suburban Trust Company for $360,000,' and I said, 'For what?'

"He said, 'For all of those things down on 301. They are going to take the Truck Stop, the Motor Lodge and the Restaurant and they are going to put everything in one big package,' and I said, 'Well, hooray, they need my signature. I won't give it to them.'

"And he said, 'Well now, Louise, you are being vindictive' and I said, 'No, I am not. You tell Arthur and Frank Wade if they want me to sign this that Arthur has first got to come up and agree to a separation and to a property settlement and to have everything settled for the children, Eddie Lee, college education for the children, and so forth. Then I will sign it.'

"And he said, 'Now, now, Louise, you are being vindictive. This is for your benefit to sign

this,' and I said to him explicitly, 'DeSales, are you telling me as my attorney that I should sign this, that this is the best thing for me to do?' and he said, 'Yes I am, Louise.' I went down and signed it."

Mr. Mudd described it as a matter of judgment, the record at one point being:

"So it's your contention, sir, that she would have 'won the battle, but lost the war', had she not signed [the Suburban Trust loan papers]? A. I think what I said was she may have won the battle but she may have lost the war by not signing this. That was a matter of judgment."

At another point the record was:

"THE WITNESS: She may have made some such comment [about this being her ace in the hole to get what she wanted for her children], and I thought that she was thinking well on that. But I think she's quoted me as saying, and I believe correctly, that I thought this was the wrong time to be vindictive, because by not signing that, and the loan not being consummated you might 'win the battle but lose the war.'

"Dr. Wooddy was paying the monthly payments on the mortgage in the home in which she was living; he was making monthly, or making payments in the North Development Company, in which she had co-interest, which was threatened with foreclosure, and I thought the calculated risk of her not signing that, for several reasons, justified her in signing it.

"One thing, she had endorsed about a $100,000 worth of demand notes that were overdue that had to be settled out of the sum of $360,000; some of the endorsers on that note and some of the endorsers were on the short-term demand notes."

As a matter of fact, the actual sum paid from the loan proceeds on indebtedness previously guaranteed by Mrs. Wooddy was $280,708.78.

In *Rippon v. Mercantile-Safe Dep., supra,* Judge (later Chief Judge) Prescott said for this Court:

> "The general rule is that an attorney at law, who has been retained and received the confidence of a client, is thereafter disqualified from acting for any other person adversely interested in the *same general matter,* however slight such adverse interest may be, *Derlin v. Derlin,* 142 Md. 352, 364, 121 A. 27, but this adverse interest must be in its nature and sense hostile, antagonistic and conflicting with the interest of the former client. 7 C.J.S., *Attorney and Client,* p. 823; 5 Am. Jur., *Attorneys at Law,* par. 65. And an attorney may represent two clients who desire the same result, although their interests vary in degree. *Busey v. Perkins,* 168 Md. 19, 25, 176 A. 474." *Id.* at 223. (emphasis in original)

In this case we fail to see where Mr. Mudd breached any duty he owed his client, Mrs. Wooddy, when he represented corporations in which she held a one-sixth interest and advised her to sign papers which lifted the possibility of entry of certain judgments immediately. He certainly was not counsel for Suburban Trust Company in the matter—nor would the fact that he was counsel necessarily give rise to a breach of ethics. The contention relative to using this transaction as a club to effect a settlement comes back to one of judgment, well summed up in Mr. Mudd's testimony. A factor not to be overlooked is the open demand notes with her signature. Again, Mrs. Wooddy has suffered no loss.

Even inexperienced trial counsel know that there must be a losing side in all litigation. It does not necessarily follow that the loser is ready to accept the final adjudication as evidence that he or she should not have pre-

vailed in the litigation. Since most human beings have a tendency to see the shortcomings of others rather than their own shortcomings, it becomes easy for a litigant to place the blame for the loss of litigation on the incompetency of counsel, rather than the weakness of his own case. It is obvious that this is not a recently developed human weakness when it is recalled that in *Matthew* 7:3-4 it is said:

> "Why do you see the speck that is in your brother's eye, but do not notice the log that is in your own eye? Or how can you say to your brother, 'Let me take the speck out of your eye,' when there is the log in your own eye?"

Mrs. Wooddy, like many unsuccessful litigants, was not prepared to adopt the philosophical point of view that this is just another of the injustices of justice.

Dr. Wooddy, as revealed through the testimony of Mr. Mudd, is something less than a model father and husband. As every bleacher fan and every Monday morning quarterback knows, it is easy to second guess any given situation. That Mrs. Wooddy would be upset at losing the case is natural. That she might seek the views of other counsel in a matter of this sort is not unusual. The second guess is not always the correct answer. It is not every second guess that generates liability in a matter of this kind. Indeed, Mrs. Wooddy's own initial evaluation and second guess may have been revealed in a letter she wrote Mr. Mudd about seven months after the divorce decree was signed and three months after Mr. Mudd had ceased being her attorney, although he apparently had worked with her then attorney (not her present attorney) in filing papers calculated to have Dr. Wooddy held in contempt. It is noted that she there placed no blame on him. In it she said:

> "Thank you for arranging the petition against Arthur for non-support and the check for $1125.00.

"I am sorry, DeSales, that I got you involved in this mess. It seems to get worse. Well, they say there is an end to everything."

Thus we reach the end. Viewing the case as a whole, Mrs. Wooddy proved the attorney's employment. She did not prove his neglect of a reasonable duty to her. She has not established any loss, even if she had proven neglect of a reasonable duty. Therefore, if there were any error in the trial of the case, it was not prejudicial error and the judgment must be affirmed.

*Judgment affirmed; appellant to pay the costs.*