534 A.2d 1003

**Roger SCHLOSSBERG, Trustee**

v.

**Philip E. EPSTEIN, et al.**

**No. 402, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Jan. 6, 1988.

Robert R. Michael (George W. Shadoan and Shadoan and Michael, on the brief), Rockville, for appellant.

John H. Bolgiano (Smith, Somerville & Case, on the brief), Baltimore, for appellee, Epstein.

Paul F. Newhouse (Alvin I. Frederick and Eccleston and Seidler, on the brief), Baltimore, for appellee, Miller.

Patrick A. O'Doherty (Thomas B. Wheeler, on the brief), Baltimore, for appellee, State Farm.

Argued before BISHOP, BLOOM and ROBERT M. BELL, JJ.

ROBERT M. BELL, Judge.

This appeal by appellant, Roger Schlossberg, Trustee in Bankruptcy for the Estate of Jorgen L. Larsen, Bankrupt, seeks reversal of the judgment of the Circuit Court for Prince George's County granting motions for summary judgment filed by Philip E. Epstein, Marvin B. Miller, and State Farm Mutual Automobile Insurance Company, appellees. Appellant's action against appellee State Farm was based upon State Farm's alleged negligent and bad faith failure or refusal to settle an underlying tort action, which resulted in a judgment in excess of Larsen's automobile insurance policy limits. His action against appellees Miller and Epstein sounded in professional malpractice. The trial judge's stated reason for granting the motions for summary judgment is that Larsen's election to file bankruptcy, rather than assign his causes of action to the plaintiff in the underlying tort action, as a matter of law, constituted a failure to mitigate damages.

On appeal, appellant, of course, challenges the stated basis for granting the motions, but he also challenges whether, given the facts of this case and the issues presented, summary judgment should have been granted on any basis. In his view, failure to mitigate damages is not a proper basis for granting summary judgment and, in any event, there are disputed issues of material fact as to all of the defenses interposed by appellees.[1]

---

1. In apparent anticipation of an argument by appellees, appellant addressed the propriety of assigning causes of actions, and, specifically, one for bad faith refusal to settle. He concluded that such assignments do not contravene public policy. Appellees, with the exception of Miller, who concedes their validity, have not addressed

*Mitigation of Damages*

In order to address whether failure to mitigate damages is, in this case, a proper issue to be resolved by summary judgment, it is necessary to put this case in procedural context. The predicate for appellant's actions against appellees is a wrongful death action which was filed by Mr. and Mrs. Thomas J. Sexton, Jr., the parents of Thomas J. Sexton, III, the decedent, against Larsen and another driver. Larsen was defended in that action by appellee Miller. Miller was employed by appellee State Farm, which carried Larsen's automobile liability insurance. Since the Sextons sought damages that exceeded Larsen's $50,000.00 liability coverage, Larsen was advised by State Farm to seek private counsel to handle the case to the extent of the potential overage. Appellee Epstein was retained by Larsen to represent him in connection with traffic charges arising out of the accident, and to prosecute a cross-claim against the other driver for injuries he sustained in that accident. Whether Epstein was also retained to represent Larsen as to the potential overage is a matter in dispute.

Attempts by the Sextons to settle the action for the policy limits before trial were rejected. The case proceeded to trial before a jury, which returned verdicts against Larsen and the other driver in an amount in excess of $500,000.00. Judgments on the verdicts were entered by the Circuit Court for Prince George's County and affirmed by this Court. *See Larsen v. Sexton, et ux.* (September Term 1982, No. 1624, filed August 30, 1983), unreported. While the appeal to this Court was pending, Larsen was offered an opportunity, by the Sextons, to assign to them any cause of action he might have against State Farm and any other responsible parties for negligent and bad faith refusal to settle. In exchange for the assignment, they offered: to forego efforts to execute or to initiate garnishment procedures on the judgment; if they were successful in prosecut-

---

the point directly. Neither Epstein nor State Farm appears to contest the point. Accordingly, we will not address the issue.

ing a bad faith action, to give Larsen credit for all sums recovered; and to file an order of satisfaction if the full amount of the judgment were recovered. Larsen refused to execute an assignment and, shortly after our mandate issued, filed for bankruptcy. Thereafter, while Larsen's petition in bankruptcy was pending, a second attempt to obtain an assignment from Larsen was made. The terms of that assignment were more favorable to Larsen than were the last.[2] Once again, Larsen refused to execute an assignment.

 The doctrine of minimization of damages is not a defense to a plaintiff's cause of action, whether that cause of action be one based in negligence or contract; rather, it is a "disability on (or a 'no right' to) recovery of reasonably avoidable damages." 22 Am.Jur.2d Damages § 30. The doctrine serves to reduce the amount of damages to which a

---

**2.** Pursuant to this assignment agreement, the Sextons would have foregone any right they would have had to execute against Larsen to recover any amount of the judgment in excess of Larsen's policy limits. Thus, the assignment would have insulated Larsen from any liability for the excess judgment.

Notwithstanding the foregoing, appellant argues, persuasively, we might add, that

... at the time the second assignment was offered to Larsen, he was without any power to accept it since he no longer had authority to alter or diminish his assets in any manner. 11 *U.S.C.* § 541(a) of the United States Bankruptcy Act states that *all* property of the bankrupt person is included in the bankrupt estate. The language of 541(a) is very broad and includes "all [and] causes of action...." *Tignor v. Parkinson,* 729 F.2d 977 (4th Cir.1984). This has been interpreted specifically to include a debtor's tort action for personal injury. *See id.* at 980. *See also In re [sic] Mills,* 46 B.R. 525 ( [Bkrtcy.] S.D.Fl.1985) and *In re [sic] Musgrove,* 7 B.R. 892 ( [Bkrtcy.] W.D.Va.1981). Once the cause of action became the property of the Estate, the Trustee became the only representative of the estate and had the sole power to sue and be sued on behalf of the estate. 11 *U.S.C.,* Section 323. Larsen retained no right to deal with property of the estate, including specifically, no right to sell, or otherwise use, the property of the estate since only the Trustee is granted such rights. 11 *U.S.C.,* Section 323. (emphasis in original)

Given the view that we take of this issue, it is unnecessary for us to consider further the validity of that position.

plaintiff might otherwise have been entitled had he or she used all reasonable efforts to minimize the loss he or she sustained as a result of a breach of duty by the defendant. *Sergeant Co. v. Pickett,* 285 Md. 186, 203, 401 A.2d 651 (1979); *M & R Builders, Inc. v. Michael,* 215 Md. 340, 354–55, 138 A.2d 350 (1958); *Garbis v. Apatoff,* 192 Md. 12, 20, 63 A.2d 307 (1949); *Groh v. South,* 119 Md. 297, 301, 86 A. 1036 (1913). Because it is aimed primarily at benefitting a defendant, the burden of proving that a loss could have been avoided by the exercise of reasonable effort on the part of the plaintiff is upon the defendant, whose breach of duty caused the damages suffered by the plaintiff. *Sergeant Co.,* 285 Md. at 203, 401 A.2d 651; *M & R Builders,* 215 Md. at 356, 138 A.2d 350. Thus, it is clear that the doctrine does not place any duty on a plaintiff or create an affirmative right in anyone. 22 Am.Jur.2d Damages § 30. *See* Restatement 2d Torts § 918, Avoidable Consequences, Comment a, where it is said:

> ... It is not true that the injured person has a duty to act, nor that the conduct of the tortfeasor ceases to be a legal cause of the ultimate harm; but recovery for the harm is denied because it is in part the result of the injured person's lack of care, and public policy requires that persons should be discouraged from wasting their resources, both physical and economic.

Thus, in order for the doctrine of minimization of damages to apply, there must first have been a breach of duty on the part of the defendant, *Sergeant Co.,* 285 Md. at 203, 401 A.2d 651, who then raises an issue as to the propriety of the losses or damages claimed by the plaintiff. Even when it is determined that the doctrine applies, the question before the Court becomes whether the plaintiff took reasonable steps to minimize the amount or extent of his or her damages. That is ordinarily a jury issue. *See Loch Hill Construction Company, Inc. v. Fricke,* 284 Md. 708, 715, 399 A.2d 883 (1979); *Myerberg, Sawyer & Rue v. Agee,* 51 Md.App. 711, 724, 446 A.2d 69 (1982). This is true even though, as is often the case, the facts upon which the

resolution of the issue depends are undisputed. Where the question involves the reasonableness of an action, it must be determined by choosing from among the inferences which the undisputed facts permit. *See DiGrazia v. County Exec. for Montgomery County*, 288 Md. 437, 445, 418 A.2d 1191 (1980); *Townsend v. L.W.M. Management, Inc.*, 64 Md.App. 55, 64, 494 A.2d 239, *cert. denied*, 304 Md. 300, 498 A.2d 1186 (1985). Moreover, necessarily involved in the resolution of such an issue is the motive or intent of the actor, which is "generally ill-suited for summary judgment". *Berkey v. Delia*, 287 Md. 302, 304, 413 A.2d 170 (1980).

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." *Brady v. Ralph Parsons Company*, 308 Md. 486, 495, 520 A.2d 717, 722 (1987), quoting Md.Rule 2–501(e). It is not a substitute for trial or a vehicle to decide disputed facts. *Coffey v. Derby Steel Company, Inc.*, 291 Md. 241, 247, 434 A.2d 564 (1981); *Berkey v. Delia*, 287 Md. at 304, 413 A.2d 170; *May Department Stores v. Harryman*, 65 Md.App. 534, 538, 501 A.2d 468 (1985), *aff'd*, 307 Md. 692, 517 A.2d 71 (1986). In reviewing a ruling by the lower court on a motion for summary judgment, we, like the lower court, must resolve all inferences against the moving party and determine whether there is a genuine dispute as to any material fact and "whether the moving party is entitled to judgment as a matter of law." *Brady v. Ralph Parsons Company*, 308 Md. at 496, 520 A.2d 717.

■ Applying this test to the case *sub judice* and, in particular, to the issue of propriety of the grant of summary judgment for failure to mitigate damages, we hold that the trial court erred. Although the facts are largely undisputed, more than one inference as to the reasonableness of Larsen's efforts to mitigate damages may be drawn from those facts. The issue was therefore one for the jury.

■ The trial court also erred for another reason. In granting appellees' motion for summary judgment, the trial court, as did appellees, stressed that had Larsen assigned his cause of action to the Sextons he would have thereby insulated *himself* from any damages as a result of the excess verdict. In other words, the focus was upon the effect the assignment would have had on Larsen; it was not upon its effect on appellees. It is, however, the latter effect upon which focus more appropriately should have been directed. Whether Larsen assigned his cause of action to the Sextons or filed for bankruptcy, as he did, appellees' exposure, and the legal position with respect to an action for damages based on bad faith refusal to settle and professional malpractice, were not affected one bit. The only thing that would have been changed had Larsen assigned his cause of action to the Sextons instead of filing for bankruptcy is the named plaintiff in this case [3]: rather than the plaintiff being the Trustee in Bankruptcy, as is the case now, the plaintiffs would have been the Sextons.

Although Larsen might have improved *his* position by executing the assignment, we fail to perceive how his refusal to do so worsened or, in any way, prejudiced appellees' position. Appellees have not provided us with an answer in their brief and they failed to do so at oral argument. As we see it, if Larsen's refusal to execute the assignment had any effect on appellees' position below, it was to improve that position since it afforded appellees the opportunity to make the argument on which the lower court relied. We hold that neither assigning the cause of action to the Sextons nor filing bankruptcy affects either the fact or extent of appellees' liability for negligent or bad faith refusal to settle. Therefore, the grant of summary judgment was, as a matter of law, error.

---

**3.** In all probability counsel would have been the same. Counsel for the Sextons in the underlying action is also counsel for the Trustee in Bankruptcy in this appeal.

## Alternative Contentions

Anticipating the possibility that we might reject the trial court's stated reason for granting summary judgment, appellees proffer alternative arguments which they contend demonstrate the correctness of the trial court's ruling. Appellees Epstein and Miller essentially argue that, as a matter of law, they are not liable because the uncontradicted facts do not establish the elements necessary to prove malpractice. State Farm, on the other hand, contends that the record supports the conclusion that, as a matter of law, it acted in good faith in refusing to settle the Sexton's claim within policy limits. Each of the appellees places great emphasis on the contention that the undisputed facts in the record reveal that Larsen did not wish the case to be settled and insisted upon the case being tried so as to clear his name. Thus, each of the appellees maintains that any damage Larsen may have suffered was attributable to his, not their, conduct.[4] We will address each of these arguments after we have set forth such facts as are necessary to place them in context.

Appellant's action against appellees Epstein and Miller alleged, in pertinent part, that they:

a. ... failed to properly and competently investigate the underlying facts surrounding the collision;

b. ... failed to properly and competently locate and interview the numerous witnesses to the collision and its aftermath;

c. ... failed to properly and competently protect and represent Mr. Larsen by insisting, demanding, and directing the State Farm Automobile Mutual Insurance Company to comply with its contractual and common law duty to

---

**4.** In his causation argument, appellee Miller asserts that "The Appellant's burden was to show that but for Mr. Miller's alleged poor trial preparation and refusal to settle, Mr. Larsen would not have been found guilty in the Sextons' wrongful death action." This appears to reflect a misconception on the part of appellee Miller, as will be made clear later, as to the required proof in this case.

Mr. Larsen to in good faith investigate and settle the case brought against Mr. Larsen by the Sextons....

These same allegations, plus one other—that "State Farm Mutual Automobile Insurance Company failed to protect Mr. Larsen by consulting or locating any expert witnesses for Mr. Larsen or deposing or interviewing any of the expert witnesses against Mr. Larsen ..."—were made against State Farm. The allegations were prompted by the following pretrial activities.

The other defendant in the Sextons' tort action having offered to settle for policy limits, the Sextons sent a demand letter to State Farm on October 14, 1981, offering to settle the case for the combined policy limits of both drivers. The offer was rejected by State Farm by letter, dated October 20, 1981, from State Farm's claim superintendent. In addition to denying the Sextons' claim, he asserted "a refusal to participate in any settlement discussions." A second attempt to settle the case on the same basis occurred at a pretrial conference on June 28, 1982.

The Sextons' last attempt to settle the case with State Farm took the form of a demand letter, dated July 1, 1982, from the Sextons' attorney to appellee Miller. Set forth in that letter was not only the status of the settlement negotiations, but also the basis for the Sextons' willingness to settle:

This will confirm our meeting at the Pre-trial conference before the Honorable Jacob S. Levin in the Circuit Court for Prince George's County on June 28, 1982. At that Pre-trial conference, it was the position of Mr. Larsen and State Farm Insurance Company that no money would be offered to the Sextons for compromise of their claim. You will likewise recall that the position of the Sextons at that time, and for some time prior to the Pre-trial conference, was that they were willing to accept the applicable policy limits of both Mr. Watkins' and Mr. Larsen's insurance policies or the sum of $350,000.00, whichever sum was the lesser.

After my prior communication to Mr. Manley, there is some concern as to my failure to discuss the facts in my demand letter. You have been in possession of a report from an expert in the field of accident reconstruction for several weeks. In addition, I have outlined more thoroughly in my Pre-trial Statement the contents of that expert's opinion as well as the opinion of an expert in the field of toxicology with respect to the facts in this case. I might add that the interrogatories that were forwarded to me required no disclosure of either of these experts unless a written report was rendered. I requested a written report from the accident reconstructionist solely for the purpose of permitting you and State Farm to be in a position to evaluate the facts of the case.

It is clear that Mr. Larsen had more than ample opportunity to avoid this accident with the exercise of the slightest degree of care on his part. As is noted in the accident reconstructionist's report, if Mr. Larsen had simply applied his brakes, there would have been no accident. Further, he had ample time and opportunity to move to the right by only a few feet in order to avoid this accident. As you know, this is exactly what was done by the witness traveling directly behind Mr. Larsen and who was, in turn, successful in avoiding the collision. Further, Mr. Larsen, by the account of three police officers or deputy sheriffs at the scene of the accident as well as the toxicologist, was operating his vehicle while under the influence of alcohol. While I am not unwilling to discuss in more detail the facts which demonstrate Mr. Larsen's negligence and liability, I am of the view that you and State Farm have made it quite clear that to do so would be to no avail.

Accordingly, the purpose of this communication is to once again convey to you my authority from Mr. and Mrs. Sexton to accept in full settlement and compromise of this case the sum of $350,000.00 or the combined total of the applicable policy limits of both Mr. Watkins' and Mr. Larsen's liability insurance policies in effect at the time of

the accident, whichever sum is the lesser. This offer of settlement will remain open until Thursday, July 15, 1982, at 5:00 p.m., at which time the offer will be automatically withdrawn and no further settlement discussions will take place concerning this case. I have thoroughly explained and detailed the reasons that Mr. and Mrs. Sexton desire to have an end to this matter in my communication to Mr. Manley of October 14, 1981. As I have already indicated, I have attached a copy of that communication to this letter for your convenience.

\* \* \* \* \* \*

Appellee Miller responded, rejecting the settlement demand on the dual bases that Larsen was not responsible for the accident and a jury verdict might be less than $20,000.00.

The matter proceeded to trial, at which the following facts were established:

... the Sexton youth was invited by appellant Larsen's son, Eric, to accompany him on a fishing trip to Point Lookout in St. Mary's County. Enroute to their destination, Larsen purchased a pint of whiskey while his two sons and Tommy Sexton were getting soft drinks.

During the afternoon and early evening, Larsen consumed part of the alcohol; six ounces by his estimate, over ten ounces by the testimony of others. At 6:30 p.m., appellant and the three boys started home. Tommy Sexton was seated in the back seat on the right side of the 1980 Mustang. Larsen was proceeding north on State Route 2/4, a two lane highway. Watkins, the driver of the second car, was proceeding south on highway 2/4. He had spent the afternoon drinking beer and whiskey at a tavern four miles from the collision site. Watkins, by his estimate, had three "boilermakers"; his blood alcohol content shortly after the collision, was consistent with eight to fifteen ounces of alcohol.

The roadway at the place of impact curved from right to left proceeding north and from left to right in a southerly direction. The northbound lane was 11'3" wide with a dirt shoulder measuring 8'1". The southbound lane was

10'10" wide a dirt shoulder 8'3" wide. Watkins, proceeding south, drove through the curve into the northbound lane of traffic and Larsen swerved to his left at the same time Watkins was attempting to get back into the southbound lane. The impact occurred at the center line with the right front fender of the Watkins' vehicle striking the right rear side of the Larsen car.

Watkins said he was changing the radio station when he realized he had driven through the curve into the northbound lane. Larsen stated that he did not see Watkins, due to the curve, until they were twenty feet apart. Reconstruction experts established, however, that the sight distance available to either driver was over 700 feet and the distance at which Larsen could have determined that Watkins was totally in the wrong lane was 480 feet. Larsen refused a breathalizer test offered by the police at the hospital. Three police officers testified that Larsen was under the influence of alcohol. An expert in the field of toxicology stated that Larsen was under the influence of alcohol when the accident occurred and his condition significantly impaired his ability to operate a motor vehicle. Watkins, according to the police officers and experts, was also under the influence which impaired his driving ability; the breathalizer test indicated Watkins' blood alcohol content to be .25. He later entered a guilty plea to a charge of driving while intoxicated.

*Larsen v. Sexton, et ux.,* slip op. at 3.

The Court of Appeals, in *State Farm v. White,* 248 Md. 324, 333, 236 A.2d 269 (1967), stated the test for determining whether an insurer's refusal to settle a claim against its insured was in "good faith":

... for an insurer to measure up to the good faith test, its action in refusing to settle must consist of an informed judgment based on honesty and diligence. Furthermore, the insurer's negligence, if any there be, is relevant in determining whether or not it acted in good faith.

Concerning the factors which impact upon the application of the test, the Court said:

In applying the "good faith" theory the courts have found that the presence of one or more of the following acts or circumstances may affect the "good faith" posture of the insurer: the severity of the plaintiff's injuries giving rise to the likelihood of a verdict greatly in excess of the policy limits; lack of proper and adequate investigation of the circumstances surrounding the accident; lack of skillful evaluation of plaintiff's disability; failure of the insurer to inform the insured of a compromise offer within or near the policy limits; pressure by the insurer on the insured to make a contribution towards a compromise settlement within the policy limits, as an inducement to settlement by the insurer; and actions which demonstrate a greater concern for the insurer's monetary interests than the financial risk attendant to the insured's predicament. (citations omitted)

*Id.*, 248 Md. at 332, 236 A.2d 269.

Consistent with *State Farm v. White*, appellant's bad faith case is premised upon the illogic, in light of the information available to appellees through the witnesses to the accident, the investigating officers, and the expert witnesses retained by the Sextons, of the defense which appellees pursued at trial. Appellant stresses that all the available information irreconcilably contradicted the factual predicate underlying that defense. Thus, appellant's rationale in support of his allegations against appellees is that had appellees sought to obtain the big picture, as opposed to focusing myopically upon the defense they had chosen to pursue, their perspective on the prospect of success, as well as the risk involved in the litigation, would have been manifestly different. The specifics of that rationale were presented by appellant in answers to interrogatories propounded by appellees Epstein and Miller. The answer to Miller's Interrogatory No. 6 is illustrative:

Mr. Larsen had admitted that he had consumed alcohol that afternoon before the fatal collision. In his answers to interrogatories he admitted having consumed four mixed drinks that contained six ounces of alcohol. Mr.

Miller's defense was that Mr. Larsen's alcohol consumption was minimal and that it was concluded several hours before so that Larsen was not under the influence at the time of the collision. However, Mr. Miller did not interview the fact witnesses present at the scene of the accident or the hospital emergency room later. These witnesses included several trained police officers, deputy sheriffs, and an emergency room nurse. Their testimony was crucial in establishing: (1) that Larsen probably consumed more than the six ounces he admitted; (2) that his drinking concluded much later in the afternoon than he admitted; (3) that following the collision the police found a cup in the car which was wet and smelled of alcohol; (4) that following the collision the police found a wet spot on the driver's side floor which smelled of alcohol; and (5) that at the accident scene and in the Emergency Room, Mr. Larsen had an odor of alcohol on his breath and evidenced other physical signs of being under the influence of alcohol. All of the above could have been ascertained by interviewing the witnesses.

## A. *Legal Malpractice*

"In a suit against an attorney for negligence, the plaintiff must prove three things in order to recover: (1) The attorney's employment; (2) his neglect of a reasonable duty; and (3) that such negligence resulted in and was the proximate cause of loss to the client." *Wooddy v. Mudd*, 258 Md. 234, 237, 265 A.2d 458 (1970), quoting *Maryland Casualty Co. v. Price*, 231 F. 397 (4th Cir.1916). Both Epstein and Miller maintain that the uncontradicted facts in the record establish conclusively that appellant did not meet this test.

## *Employment*

Miller acknowledges that he was employed, albeit by State Farm, to represent Larsen. Epstein, on the other hand, while acknowledging that he monitored Larsen's defense by State Farm and Miller, states that the fact that he was not employed in the defense of Larsen at the trial of the underlying accident case stands uncontradicted. Thus,

he maintains that "[t]here is absolutely no evidence at all that Mr. Epstein, in connection with the defense of Larsen, had any duty to personally conduct additional investigation or to note depositions in defense of the suit against his client."

Contrary to appellee Epstein's deposition testimony, there is evidence in the record tending to prove that Epstein was employed to defend Larsen, at least to the extent of the prayer for damages in excess of State Farm's policy limits. That evidence is contained in the deposition testimony of appellee Miller. Miller characterized Epstein's role in the litigation as, "representing Mr. Larsen and the two boys, the Larsen boys for their personal injury" and as "help[ing] me try the case. He was also in there to handle Larsen's potential liability over policy limits." Miller also testified that his characterization was based upon discussions between himself and Epstein. Furthermore, other evidence in the case tends to corroborate Miller and also to contradict Epstein's assertion that he was not employed to represent Larsen in the underlying case: State Farm advised Larsen as to the potential for liability above policy limits and advised Larsen to obtain a lawyer. This, and the fact that Epstein *was involved* in the case, permit the inference that Epstein was representing Larsen.

### Neglect of Reasonable Duty

Miller and Epstein aver that the uncontradicted facts demonstrate that neither of them neglected a reasonable duty owed to Larsen. Critical to their argument are their contentions that (1) Larsen insisted upon litigating the underlying accident, thereby precluding its settlement by State Farm and (2) that their decision to pursue the defense of the case and the defense chosen were matters of trial strategy, which may neither be second guessed by Monday morning quarterbacks nor form the basis for a legal malpractice action.

In advancing the former claim, Miller and Epstein place great emphasis on the fact that the decision whether to

accept a settlement offer is the responsibility of the client. *See* Md.Rules, Code of Professional Responsibility Canon 7, Ethical Consideration 7–7.[5] Since, they asseverate, appellant stands in the shoes of Larsen, he is subject to the same defenses that could have been made had Larsen been the plaintiff. And because Larsen was responsible for his own damages by refusing to permit settlement of the claim, appellant's claim for malpractice and bad faith refusal to settle was properly resolved by summary judgment.[6]

■ There are two responses to this contention. First, what Larsen's intentions were with regard to settlement is a matter in dispute, and a material one at that. Epstein wrote a letter to State Farm demanding that the case be settled within policy limits. In that letter, he stated that the demand was being made at the request and concurrence of Larsen. A request that a suit be settled within policy limits is inconsistent with the actions and statements attributed to, and in some instances confirmed by, Larsen. What to make of the inconsistency, that is, what were Larsen's intentions with regard to settlement, is an issue to be resolved by the trier of fact. Pertinent to that issue is

---

**5.** Effective January 1, 1987, the Court of Appeals adopted the Maryland Rules of Professional Conduct, which superceded the Code of Professional Responsibility. Rule 1.2., Scope of Representation, is now the applicable rule.

**6.** State Farm makes a similar argument, relying upon *Eklund v. Safeco Ins. Co.,* 41 Colo.App. 96, 579 P.2d 1185 (1978) and *Puritan Insurance Co. v. Canadian Universal Insurance Company,* 775 F.2d 76 (3rd Cir.1985). The cases stand for the proposition for which they are cited, namely, that an assignee may not recover when its assignor has dictated or acquiesced in the refusal to settle; however, in each of these cases, the insured was fully informed of the progress of settlement negotiations and the uncontradicted facts demonstrated that the insured absolutely refused to permit settlement or insisted that the case be tried. In *Eklund,* for example, the insured after conducting his own investigation threatened to cancel all insurance with the insurer if the case were settled, and, in *Puritan,* the insured directed the case to be tried after having been fully informed of the risk involved. *Eklund,* 579 P.2d at 1186, *Puritan,* 775 F.2d at 80. Unlike in those cases, the very issues about which there were no disputes are very much disputed in the case *sub judice.*

whether the request made by Epstein and concurred in by Larsen was withdrawn or seriously intended in the first place.

The second response involves a determination whether the decision Larsen made concerning settlement was a fully informed one. The mere fact that an insured wishes to have his case litigated does not preclude that insured from maintaining an action against his insurer for negligent and bad faith refusal to settle. *See State Farm v. White,* 248 Md. at 328, 236 A.2d 269. To preclude the insured from maintaining such an action, the evidence must demonstrate that his decision not to settle was a fully informed decision. In the case *sub judice,* Larsen testified in deposition that he met with Miller for a brief time, during which meeting no settlement discussions were had. He further testified that he was not aware of the specifics of what his attorneys were doing and that he "got only a little wind of [what they did] once and a while." From this testimony, it could be inferred that Larsen was never given all of the information necessary to permit him to make an informed decision with regard to settlement. Thus, a jury could find that he was not precluded from prosecuting an action for bad faith refusal to settle. That the evidence of Larsen's actions, both pretrial and post trial, is in conflict with his statements at deposition merely buttresses the conclusion that summary judgment was inappropriate on this basis.

Epstein, still relying on his letter requesting settlement within policy limits, also argues that the decision to settle the case was that of State Farm, which rejected his suggestion. Thus, he says he did not breach any duty owed to Larsen.

It is undisputed that Epstein wrote a letter requesting that the case be settled within policy limits. What is disputed is whether Epstein ever withdrew that request or intended it to be taken seriously. Despite Epstein's testimony that he did not withdraw his letter, appellee Miller testified to the contrary that Epstein did withdraw the

request that the case be settled, albeit after the date when the offer had expired. Moreover, there was testimony that the letter was a form letter, from which it could be inferred that the request it made was not intended to be a serious one. Therefore, we do not believe that the fact that Epstein requested settlement, as a matter of law, justified entry of summary judgment in his behalf.

## B. *Trial Strategy/Good Faith of Insurer*

The contentions of Epstein and Miller that their actions in this case were dictated by their selection of a trial strategy in light of the facts known to them, which cannot form a basis for a legal malpractice action, is closely related to the contention of State Farm: its decision to refuse settlement in this case was honestly made with full information as to the facts and due regard for the interest of the insured. We will therefore address them together.

Each of the appellees rely heavily upon the fact that the Sextons' attorney provided them with detailed information concerning their case. Thus, appellees state that they were fully aware of the potential evidence in the case: what the eyewitnesses would testify about, what the police witnesses would say, who the expert witnesses were who would be called, and what these witnesses' conclusions would be. Moreover, they stress that they were in possession of the police investigation reports and that all of the parties to the proceeding, some of the independent witnesses to the accident, had been deposed. Additionally, appellees point out that they knew that Larsen had been drinking at the time of the accident, but they also knew that the other driver had been drinking and was driving on the wrong side of the road. Epstein and Miller assert that their decision not to conduct further discovery was trial strategy which cannot now be second guessed. State Farm asserts that its decision to reject settlement was an informed one.

It is of course true that hindsight, critical of an attorney's trial strategy, ordinarily is not sufficient to establish that the attorney has committed legal malpractice.

*See Mudd,* 258 Md. at 238, 265 A.2d 458; *Fishow v. Simpson,* 55 Md.App. 312, 317, 462 A.2d 540 (1983). This is not, however, a typical case; it is one on which the special gloss of *State Farm v. White* has been firmly implanted. That case, as we have seen, requires that, in an action based upon negligent and bad faith refusal to settle, the actions of the defendants must be analyzed with a view to determining whether the decision to refuse to settle was an honest, informed one which takes into account the interest of the insured. 248 Md. at 330–32, 236 A.2d 269. This requires that a number of factors be taken into account, among which are:

> The severity of the plaintiff's injuries giving rise to the likelihood of a verdict greatly in excess of policy limits; lack of proper and adequate investigation of the circumstances surrounding the accident; lack of skillful evaluation of plaintiff's disability; failure of the insurer to inform the insured of a compromise offer within or near the policy limits; pressure by the insurer on the insured to make a contribution towards a compromise settlement within the policy limits, as an inducement to settlement by the insurer; and actions which demonstrate a greater concern for the insurer's monetary interest than the financial risk attendant to the insured's predicament.

248 Md. at 332, 236 A.2d 269. Thus, the issue in such a case is the factual one, whether the insurer acted in good faith. *Cardin v. State,* 73 Md.App. 200, 212–214, 533 A.2d 928 (1987). In the case of the attorneys accused in such a case, the same factors are applicable and, consequently, determining whether they were negligent must be approached from the same perspective.

In the case *sub judice,* contrary to appellees' contentions, there are disputed issues of material fact which must be resolved by a jury. Granted, appellees were apprised by the Sextons' attorney of the thrust of their case, including the witnesses on whom they would rely and a summary of their testimony. This, in and of itself, does not prove that appellees necessarily, and as a matter of law,

had all of the information they needed to make an informed, good faith decision not to settle. That a witness' testimony is provided by the proponent of an issue to his or her opponent's attorney does not, as a matter of law, apprise that attorney of all that he or she might need to know in order adequately or accurately to assess the risk involved in the litigation. Whether the information supplied was sufficient depends not only upon an assessment of what was supplied but also of what was not supplied. The Sextons' answers to interrogatories reveal that several important details were omitted from their summary of the testimony of the witnesses the Sextons' proposed to call. Moreover, it is obvious that a summary of testimony does not convey the strength with which a witness may testify or the quality of that testimony. Considering the defense pursued at trial and the questionable merit of that defense, in light of the evidence produced at trial, a trier of fact could find that appellees Miller and Epstein failed to conduct a proper and adequate investigation of the circumstances surrounding the accident. From this, it could have found that appellee State Farm did not act in "good faith" when it refused to settle within policy limits.

JUDGMENT REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEES.