STRING *v.* STEVEN DEVELOPMENT
CORPORATION

[No. 347, September Term, 1972.]

*Decided July 27, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Robert E. Bullard,* with whom were *Bullard & Deutchman* on the brief, for appellant.

*George F. Paxton* for appellee.

LEVINE, J., delivered the opinion of the Court.

Having convinced himself that his new home would not be completed on schedule, appellant (String) declared the contract providing for its purchase "null and void." Subsequently, he brought this action against appellee (Steven) in the Circuit Court for Montgomery County, seeking the return of his deposit and the reimbursement of a loan commitment fee paid to a savings and loan association. At the conclusion of the trial, presided over by Judge Cahoon sitting without a jury, a judgment for costs was entered in favor of Steven. This appeal followed.

On April 15, 1971, String executed a contract for the

purchase of a house that was to be built by Steven in its Bedfordshire subdivision of Montgomery County. String agreed to pay $45,751, of which $41,176 was to be furnished by a first trust to be placed by him with Standard Savings & Loan Association. The contract, which was accepted by Steven on April 20, 1971, also provided:

> *"Within 130 days* from date of acceptance hereof by the Seller . . . the Seller and Purchaser are required and agree to make full settlement in accordance with the terms hereof. If the Purchaser shall fail to make full settlement, the deposit herein provided for may be forfeited at the option of the Seller, in which event the Purchaser shall be relieved from further liability hereunder . . . ." (emphasis added).

Beginning in May, String made frequent visits to the building site to inspect the progress of construction. Observing no evidence of activity, he checked with the county authorities, and also examined the land records at the court house. From these inquiries he learned, on June 18, that neither a building permit had been issued nor a construction loan recorded. Armed with this information, he directed his attorney to write a letter requesting the return of his deposit. On June 21, his attorney wrote to Steven as follows:

> "According to the contract, the seller is to complete improvements on the lot and make settlement before August 28, 1971, which is obviously impossible because to date, there is not even a building permit issued.
>
> " . . . [T]he Strings obtained a mortgage loan commitment from Standard Savings and Loan Association, which commitment expires August 20, 1971, and has already cost the Strings $427.00, which the lender refuses to return.
>
> "Since it is impossible for your principal to comply with its contract to deliver the premises on

or before August 28, 1971, we *demand refund of the $1,000.00 deposit and declare the contract* of August 28, 1971, [sic] *breached and null and void."* (emphasis added).

Steven's attorney replied on July 16, 1971:

"Contrary to your letter, we understand that a building permit has been issued on the premises and a foundation installed. Steven hopes to have the residence complete by the anticipated date even though there have been unforeseen delays encountered. In the event that it is not complete in time we understand Standard Savings will extend their loan commitment accordingly.

"We also understand that the purchasers have simply had a change of heart, which is not sufficient cause for cancellation of their contract. If this is in fact the case, Steven will consider forfeiture of the deposit as its sole remedy under ... the contract and treat your letter as an anticipatory breach thereof . . . ."

On August 18, Steven's attorney again wrote:

"Having received no reply to my letter of July 16, 1971, in response to yours reference the above, Steven Development Corporation has elected to treat your letter, particularly the last paragraph thereof, as an anticipatory breach of the contract between the parties.

"Accordingly, Steven hereby declares your clients' deposit forfeited under paragraph six (6) of said contract and thereby, in consideration of such forfeiture, relieves your clients from further liability thereunder."

It appears to be conceded that construction of the house did commence on or about July 2, the date on which the building permit was issued. Photographs taken by String at three stages during August were admitted into evidence. At

the beginning of the month, there existed a frame structure "under roof" and no garage. A picture taken on August 28 reflects substantial, if not dramatic, progress. For example, the house appears to have been completely "bricked up" and the garage completed.

After Steven refused to return the deposit and reimburse the loan commitment fee, the scene shifted to the circuit court. There, the evidence disclosed that following execution of the contract, which specified that the house was to be built in accordance with attached plans, String had sought a number of changes in design, including some which were structural. The only witness to testify at the trial, other than String, was George Young (Young), an officer of Steven; he was called by the plaintiff. He testified, without contradiction, that even as late as May 11, String was still "asking for changes in his home." Young said that these changes, which he characterized as major, delayed the commencement of construction by at least one month and, thereby, Steven's ability to complete the house in the specified period of time.

There was also testimony by Young that after receiving the letter of June 21 declaring the contract "null and void," Steven relaxed its schedule for completing the house; and, anticipating that a substituted purchaser might not desire the changes initiated by String, diverted its immediate efforts to other houses under construction. But for the changes, according to Young, the house could have been "just about" completed by the end of August. He said that even with the delay attributable to the design changes, if there had been no "breach" by String, the house would have been completed within a reasonable time following expiration of the 130 days designated in the contract. Indeed, he testified that the house could have been built in a total of 90 days which, even with the changes and the July starting date, would have meant a delay of only one month beyond the 130 days. As evidence of Steven's ability to do so, Young pointed to other projects in which it had completed houses within 90 days, in some cases even under unfavorable weather conditions.

In his trial testimony, String revealed for the first time that the 130-day period specified in the contract:

> "was very important in that it made the contract termination date or completion date within fifteen days of the time school was starting. That gave me a reasonable time to get a family in and settled, after they had been settled and having to move from California. I turned down or ceased negotiations with the other builders before this. They did not promise me occupancy by the time school started. That was the important factor in my purchase of a house."

He also testified that when, in his "judgment or determination," the house would not be ready by the designated date, he rented a house in Vienna, Virginia. Precisely when he actually entered into that arrangement is not disclosed by the record. Judging from the remaining evidence, it could have been any time after June 18, when he instructed counsel to write the letter declaring a breach by Steven.

At the conclusion of the evidence, Judge Cahoon rendered judgment in favor of Steven. In so doing, he held that since time was not of the essence, Steven "had a reasonable period in which to complete the construction"; and he found, as a fact, that it could have done so. Accordingly, he concluded that String had failed to establish an anticipatory breach, under the circumstances of this case, by relying merely on the belated commencement of construction. In effect, he held that it was String, himself, who had committed the breach in adopting the stance reflected by the letter of June 21.

On appeal String contends, as he did below, that the action of the builder in beginning construction "less than two months before the delivery date," constituted an anticipatory breach of the contract. Therefore, he says, his action in declaring the contract null and void was justified. Steven, of course, levels the same charge of anticipatory breach at String. From these cross-contentions, as it were,

emerges the principal issue to be decided on this appeal: Whether String breached the contract by taking the position announced in his attorney's letter of June 21; or whether Steven did so by delaying construction to the point of rendering impossible a timely performance on its part.

As we view the case, however, we are confronted with a threshold question that is pivotal to the main issue: Whether time was of the essence; and, if not, whether the trial judge was correct in determining that Steven, if afforded a reasonable time after August 28 in which to complete the house, could have done so. A conclusion that time was of the essence would be virtually dispositive in light of the uncontradicted evidence that even without the relaxed effort following the June 21 letter, the house would not have been completed until a month after August 28. Thus, given a holding that time was of the essence, String's judgment of June 21 that the house would not be completed on August 28 — and that Steven had thereby committed an anticipatory breach — might conceivably have been invulnerable to attack.

The remaining question posed by String is whether the trial judge erred in ruling that the testimony of Young, called as an adverse witness by String, "is chargeable to him."

(1)

Long ago, in *Scarlett v. Stein*, 40 Md. 512, 525-26 (1874), our predecessors enunciated the general principle that:

> "Parties may, no doubt, make time an essential part of a contract, and in such cases, the failure by one of the parties to perform his part of the obligation within the time prescribed, discharges the other from all liability under the contract. *Whether time is to be considered as of the essence of the contract, must, of course, depend upon the intention of the parties.* When this intention is expressed in clear and unambiguous terms, the contract must speak for itself, and the liability of

the parties must be determined by the plain and obvious meaning of the language used. *If, however, this intention is not expressed in clear and direct terms, courts may look to the acts and conduct of the parties,* in order to find out the meaning which they themselves have put upon the contract." (emphasis added).

That rule has been consistently followed by this Court, *St. Paul at Chase v. Mfrs. Life Insur.,* 262 Md. 192, 222-23, 278 A. 2d 12 (1971), *cert. denied,* 404 U. S. 857, 92 S. Ct. 104, 30 L. Ed. 2d 98; *Vincenti v. Kammer,* 189 Md. 523, 529, 56 A. 2d 688 (1948); *Diamond v. Shriver,* 114 Md. 643, 80 A. 217 (1911).

In *Scarlett,* a contract for the sale of land contained the language, "balance of purchase money to be paid within thirty days from date." Those words were not viewed as an expression of intent that time was to be of the essence. Nor, as disclosed by the evidence there, was such an intention established by the "acts and conduct" of the parties subsequent to its execution.

While tacitly conceding that the words used in the contract here are not alone sufficient to establish that time is of the essence, String maintains that his testimony regarding the importance of completion before the school term sustains his position that it was. From that testimony, he fashions the argument that he has brought himself within the "acts and conduct" requirement mentioned in *Scarlett.* In support of this contention, he relies heavily on *Acme Bldg. Co. v. Mitchell,* 129 Md. 406, 99 A. 545 (1916). There, a contract for the sale of land provided that settlement should be made "within forty days" from the date of the contract. In denying specific performance sought by the vendee, the Court quoted the general rule, but held that time was of the essence because it was, to the vendor, "his main inducement for making the sale at that time. The anxiety of the vendor to have the purchase closed within the period agreed upon *was constantly impressed on the vendee's representative* . . . ." 129 Md. at 410 (emphasis added).

The inappositeness of this argument here is immediately apparent. Unlike the situation in *Acme*, where the materiality of the time provision was "constantly impressed" upon the purchaser during and following negotiations, here the importance of completion by August 28 was a closely-guarded secret until the trial. It seems strange that if occupancy of the new home before the school term opened was so important to String, he did not inform Steven of that fact in the June letter; if, indeed, not before then. In these circumstances, time was not made of the essence by the "conduct of the parties."

The court below held that since time was not made of the essence, the parties were required to settle within a reasonable period. String does not challenge this proposition, but focuses his attack on the trial judge's decision that completion thirty days after the date specified in the contract would have been a reasonable time for performance. In *Doering v. Fields*, 187 Md. 484, 50 A. 2d 553 (1947), the Court, in noting that the provision "within 45 days from date of contract" did not make time of the essence, said:

> "It is true that they [the parties] are presumed to know that such a period in a contract affecting real estate is relative and is not to be interpreted absolutely literally. It is just as true that it means something. It is not to be totally disregarded. It is an approximation of what the parties regard as a reasonable time under the circumstances of the sale." 187 Md. at 490.

There, however, the defaulting purchaser sat by idly during the entire forty-five days. Hence, the Court said:

> "That is not what is meant by saying that time is not of the essence of a contract for the sale of real estate. It does not mean that one party can rely upon that principle to do nothing and embarrass the other. It means that neither party will be held strictly to the time limited, not that either party

will be at liberty to disregard it entirely." 187 Md. at 491.

Here, Steven did not remain idle for 130 days. It made substantial progress in construction during that period despite the delays caused by the changes and the letter. The trial judge, sitting as the trier of fact, found from the evidence that the house would have been completed within a month thereafter; and that this was "reasonable" under the circumstances. We cannot say that his judgment was "clearly erroneous," Maryland Rule 886.

(2)

String's position that a breach of contract resulted from the delayed construction is bifurcated. The first part of this contention is bottomed on the traditional concept of anticipatory breach, or "anticipatory repudiation," as it has been called by the commentators. For authority, he relies solely on the *Restatement of Contracts*, § 318 (1932), which generally states the "traditional" rule. He quotes the following portion:

> "Except in the cases of a contract originally unilateral and not conditional on some future performance by the promisee, and of a contract originally bilateral that has become unilateral and similarly unconditional by full performance by one party, any of the following acts, done without justification by a promisor in a contract before he has committed a breach under the rules stated in §§ 314-315, constitutes an anticipatory repudiation which is a total breach of contract:

* * *

> "(c) any voluntary affirmative act which renders substantial performance of his contractual duties impossible, or apparently impossible."

String follows this by quoting Illustration 6:

> "A contracts to work for B, and B contracts to

employ A, for a year beginning in ten days. Three days after making the contract A embarks in a vessel for a voyage around the world. A has committed an anticipatory breach of contract."

He would have been much closer to the mark, however, had he quoted Illustration 11:

"A contracts with B in May, 1929, to have a specific vessel at B's wharf in New York on July 1, 1929, ready to load and carry a cargo for B. At the time when the contract is made, the vessel is in Charleston, South Carolina. After making the contract A determines not to perform it, though he does not so state, and permits the vessel to remain at Charleston until after July 1. *There is no breach until that day.*" (emphasis added).

which relates to Comment i:

"Though where affirmative action is promised, mere failure to act, at the time when action has been promised, is a breach, failure to take preparatory action before the time when any performance is promised is not an anticipatory breach, even though such failure makes it impossible that performance shall take place, and though the promisor at the time of the failure intends not to perform his promise."

We recognized the distinction, which String seems to have overlooked, between a mere failure to prepare for performance and a specific anticipatory repudiation in *Weiss v. Sheet Metal Fabricators*, 206 Md. 195, 203-04, 110 A. 2d 671 (1955):

" . . . It was said in *Friedman v. Katzner,* 139 Md. 195, 201, 114 A. 884 [1921]; 'A breach of contract is a failure without legal excuse to perform any promise which forms the whole or part of a contract . . . , and may be inferred from the "refusal of a party to recognize the existence of a contract,

or the doing of something inconsistent with its existence" . . . , and when "in anticipation of the time of performance, *one definitely and specifically refuses* to do something which he is obliged to do, so that it amounts to a refusal to go on with the contract, it may be treated as a breach by anticipation, and the other party may, at his election, treat the contract as abandoned, and act accordingly. This principle is well settled and applied in many cases. . . ." But refusal to perform *must be positive and unconditional,* (citations omitted).' " (emphasis added).

*Weiss* has been cited and quoted with approval by the commentators, *see* 4 Corbin, *Contracts,* § 974 (1951, Supp. 1971); 11 *Williston on Contracts,* § 1300 (3rd ed. 1968). Clearly, under the facts of this case, a mere delay in preparing for construction, or in its commencement, unaccompanied by any other words or acts reflecting a repudiation of the contract, was insufficient to establish an anticipatory breach by Steven.

But, String says, Steven did breach the contract by causing the former to materially change his position in reliance on Steven's "apparent inability" to perform as of June 21. For this contention, he relies exclusively on Section 323 of the *Restatement,* which he quotes in full together with its comments. In our view, this argument is without merit.

Among the reasons why this contention cannot be sustained is that the only action by String which could have amounted to a material change of position was the arrangement to lease a home in Virginia. The record, however, is silent on when this occurred. String's testimony merely indicates it followed his "judgment or determination" that the house would not be available at the time he required it. Precisely when he arrived at that "judgment or determination" is not revealed by the evidence in this case. In any event, it is entirely logical to conclude from this silent record that the house was leased in Virginia after the forfeiture was declared in August. As such, it could

not have been a material change of position in reliance upon Steven's "apparent inability" to perform.

A second answer to this argument is that, as we have previously said, the importance of the August 28 completion date was not known to Steven; furthermore, as we also noted earlier, Steven was afforded a reasonable time after August 28 in which to complete the house. Hence, String's judgment of Steven's "apparent inability" to perform was entirely subjective and premature. His change of position, even assuming *arguendo* that it occurred about June 21, was therefore not, in the language of Section 323, "in *reasonable* reliance" on Steven's "apparent inability." (emphasis added).

Having declared the contract "null and void" on June 21 without any legal basis for doing so, String, himself, committed an anticipatory breach. It cannot be denied that his repudiation was "positive and unconditional," *Weiss v. Sheet Metal Fabricators, supra.* Even after writing that letter, however, the way was left open to performance by the letter of July 16. When he opted to ignore that invitation, the forfeiture provision in the contract was properly invoked.

(3)

In his opinion, the trial judge, in referring to the testimony of Young that the house could have been completed within a reasonable time after August 28, said it was "chargeable" to String who called him as his witness. Appellant says that the court incorrectly applied the general rule that one who calls an adverse party as a witness is bound by his testimony unless it is rebutted, contradicted or discredited, *Wooddy v. Mudd,* 258 Md. 234, 240, 265 A. 2d 458 (1970); *Larsen v. Romeo,* 254 Md. 220, 225, 255 A. 2d 387 (1969); *Williams v. Wheeler,* 252 Md. 75, 249 A. 2d 104 (1969). Actually, he does not quarrel with the rule. Rather, he attacks the trial judge's acceptance of that testimony given by Young.

To be sure, we have held that the rule regarding testimony of adverse witnesses should not be interpreted to mean that the jury (or, for that matter, the judge sitting as the trier of fact) must accept such statements blindly, particularly if the

testimony contains improbabilities, or there are reasonable grounds for concluding that it is erroneous, *Nizer v. Phelps*, 252 Md. 185, 204, 249 A. 2d 112 (1969); *P. Flanigan & Sons v. Childs*, 251 Md. 646, 652, 248 A. 2d 473 (1968). There is nothing, however, in this qualification that precludes the trial judge, sitting without a jury, from applying the general rule where, as here, he arrives at the conclusion — supported by the record — that the testimony of the adverse witness is unrebutted or uncontradicted. Clearly, it cannot then be said that the witness's statements were "blindly" accepted. Whether, in these circumstances, the testimony in question was contradicted, discredited, or contained improbabilities was addressed to the court, cast in its role as the trier of fact. Its judgment in that regard, as with the substantive question of when the house might have been finished — discussed earlier — is not clearly erroneous, Rule 886.

*Judgment affirmed; appellant to pay costs.*