**CHOICE HOTELS INTERNATIONAL, INC., Plaintiff,**

v.

**MADISON THREE, INC., Herbert G. Ingram, R. Norman Peters and David G. Massad, Defendants.**

**Civil No. AMD 98–634.**

United States District Court, D. Maryland.

Feb. 7, 2000.

myriad other factors, has been floated as a possible cause of fibromyalgia.

James G. Healy, Silver Springs, MD, for Plaintiff.

Steven M. Pavsner, Joseph, Greenwald & Laake, Greenbelt, MD, Roy A. Bourgeois, Bourgeois Dresser & White, Worcester, MA, for defendants.

## MEMORANDUM

DAVIS, District Judge.

The plaintiff, Choice Hotels International, Inc., filed suit against defendants Madison Three, Inc., Herbert G. Ingram, R. Norman Peters and David G. Massad (together, "Madison") for damages arising out of the termination of a franchise agreement related to the operation of a hotel in Worcester, Massachusetts, under Choice's Clarion® trademark.[1] Jurisdiction is based on diversity of citizenship and the parties agree that Maryland law applies.

Discovery has been completed and Choice has filed a motion for summary judgment. The motion has been fully briefed and no hearing is needed. For the reasons stated below, the motion for summary judgment shall be granted in substantial part.

### I

Choice alleges Madison breached the franchise agreement (the "Agreement") entered into by the parties on or about March 29, 1990, by failing to pay monthly service, marketing, and advance reservation fees as required by the Agreement. There is no dispute that Madison acted unilaterally and ceased making the payments required under the Agreement. Thus, Choice has established a *prima facie* case of breach of contract, and the burden is upon the defendants to show that, based upon the evidence they have amassed in the context of these summary judgment proceedings, a reasonable jury could conclude by a preponderance of the evidence that Choice is not entitled to recover. *See Kruvant v. Dickerman,* 18 Md.App. 1, 305 A.2d 227, 229 (1973)(noting that Maryland follows the general rule that "in either breach of contract or tort cases . . ., the burden of proof is on the . . . party who asserts the affirmative of an issue, and that burden never shifts"); *and see id.* ("An affirmative defense is one which directly or implicitly concedes the basic position of the opposing party, but which asserts that notwithstanding that concession the opponent is not entitled to prevail because he is precluded for some other reason.").

In this case, the "some other reason" relied upon by Madison is that Choice itself breached the Agreement, and thereby relieved Madison of its duty of performance. *See* Defs.' Opp. Mot. Summ. Judg. at 1 ("This case is about [Choice's] . . . breach of contract and purposeful abandonment of the 'Clarion Suites' franchise and, more particularly, the lone remaining Massachusetts franchise."). When viewed through the prism of Fed.R.Civ.P. 56, therefore, Madison is obliged at this stage of the case to project admissible evidence sufficient, if believed, to persuade a reasonable juror that its assertion that Choice committed one or more material breaches of the Agreement is more likely so than not so. *Beard Plumbing & Heating, Inc. v. Thompson Plastics, Inc.,* 152 F.3d 313, 315 (4th Cir.1998)("[T]he moving party is entitled to summary judgment if the non-moving party has failed to make a sufficient showing on an essential element of the case with respect to which the non moving party has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)."). For the reasons set forth below, Madison has failed to make the necessary showing. Accordingly, Choice is entitled to judgment as a matter of law.

---

1. The individual defendants are principals of the corporate defendant and each executed a guaranty to secure the corporate defendant's obligations. No issue has been raised as to the joint and several liability of all defendants. *See* the earlier opinion in this case reported at 23 F.Supp.2d 617 (D.Md.1998).

## II

A significant reason that Madison is unable to survive summary judgment lies in the deficient affidavit of its principal, Herbert G. Ingram. Rule 56 affidavits must contain *factual* matters and other information " 'such ... as would be admissible in evidence.' Fed.R.Civ.P. 56(e)." *Sakaria v. Trans World Airlines,* 8 F.3d 164, 171 (4th Cir.1993), *cert. denied,* 511 U.S. 1083, 114 S.Ct. 1835, 128 L.Ed.2d 463 (1994). In blatant violation of this longstanding rule, the Ingram affidavit is an extraordinary mosaic of conclusory, impressionistic, argumentative suppositions, describing intuitive "divinations" about what Madison "perceived" and thus "concluded" about Choice and its intentions, many of such conclusions having been shown by competent evidence to be demonstrably incorrect. In short, the Ingram affidavit is a masterpiece of lawyerly craftsmanship wholly lacking, in most respects, the essential characteristics of a proper Rule 56 affidavit.

Accordingly, Choice having timely moved to strike the Ingram affidavit, that motion is granted in significant part.[2] Specifically, the following portions of the Ingram affidavit are stricken: (1) first sentence of ¶ 4; (2) all of ¶ 5; (3) last sentence of ¶ 6; (4) all of ¶ 8; (5) second sentence of ¶ 9; (6) all of ¶ 10; (7) first sentence of ¶ 11; (8) first two sentences of ¶ 12; (9) first sentence of ¶ 13; (10) third, fourth and fifth sentence of ¶ 14; (11) third sentence of ¶ 15; (12) last sentence of ¶ 16; (13) all of ¶ 17; (14) all of ¶ 18; (15) last sentence of ¶ 19. This ruling is embodied graphically in the "redlined" copy of the affidavit which is attached to this Memorandum.

**2.** Madison has also moved to strike certain of Choice's affidavits, harkening back to a discovery dispute between the parties. That motion is denied.

**3.** In blatant disregard of the local rules, Madison attempted to cure the problems identified

## III

Without the deletions from the Ingram affidavit identified above, Madison's version of the events leading up to its unilateral decision to cease its payments to Choice is incoherent. Set forth in this part III of the memorandum, therefore, is a recitation of facts using as little of the deleted portions of the Ingram affidavit as is possible, while giving a coherent account of the parties' dispute.[3]

Under the Agreement, Choice licensed the hotel owned by Madison in Worcester, Massachusetts (the "Hotel") to participate in and operate under the "Clarion" system. Accouterments of participation in the Clarion franchise system include, among other benefits, use of the Clarion Suites name, a proprietary mark owned by Choice, exposure resulting from Choice's promotion and advertising of the Clarion mark and the use and benefit of the advance registration system operated by Choice.

Pursuant to a "no cause" termination clause, either party could opt out of the Agreement on its fifth, 10th or 15th anniversary. *See* the Agreement, ¶ 3(b). The first opt-out date was June 17, 1995.

The Hotel is somewhat unique among hotel properties operating within the Choice system for two reasons. First, the Hotel consists of suites intended to be let for longer than one- or two-night stays. The "Clarion Suites" brand of hotel licensed by Choice is positioned for this type of market, targeting guests who require long-term accommodations. Second, in addition to units within the Hotel available for letting are privately owned condominium units.

In early 1995 Madison became concerned that Choice was not promoting the "Clarion Suites" brand as actively as it had

by Choice in the Ingram affidavit by filing a supplemental affidavit and a surreply memorandum without leave of court. The surreply is stricken and the supplemental affidavit does not cure the deficiencies, in any event.

promised under the terms of the Agreement. Under the terms of the Agreement, Madison was obligated to pay a monthly marketing fee, the proceeds of which Choice covenanted to use "for the purpose of national and international advertising, promotion, publicity, market research and other marketing programs and related activities for the Clarion name, reputation and System as [Choice] in its sole discretion may from time to time *reasonably* determine to be necessary and appropriate." Agreement, ¶ 4(b) (emphasis added). Implicit in Madison's view that Choice was obligated to specifically promote the Clarion Suites brand is Madison's belief that such advertising was "reasonably . . . necessary and appropriate" under the Agreement.[4]

The concern described above led Madison to consider the exercise of its right to opt out of the Agreement under the no cause termination clause on the first available date, July 17, 1990. Madison's concern that Choice was not promoting the Clarion Suites brand was based on its having an unexplained "perception" that it was so. This perception was based in part on a belief (shown to be demonstrably false in the record) that Choice, by merger or other process of acquisition, had come into ownership of brands that were similar to and in competition with the Clarion Suites brand. As a result, Madison unilaterally concluded that Choice was abandoning the Clarion Suites brand in favor of competing brands acquired by Choice.

While these alleged concerns were under Madison's consideration, in addition, "a number of problems had arisen" with respect to the Hotel, Ingram Aff., ¶ 6, and Madison believed that Choice had "become increasingly insensitive to the [Hotel's] financial performance. . . ." *Id.* Apparently, Madison was in arrears for $86,509.23 in franchise fees.

As a result of Madison's concerns with Choice's level of promotion of the Clarion Suites brand and its attendant contemplation of opting out of the Agreement on the one hand and Choice's problems with Madison's arrearage on the other, the parties entered into negotiations. Madison contends that Choice made specific public representations to the effect that Choice intended to mount a program to actively promote and advertise the Clarion Suites brand as part of the negotiations.

The negotiations concluded with the parties entering into a Settlement Agreement (the "Settlement") in January 1996, well after Madison's right to "opt out" of the Agreement in 1995 lapsed. Madison contends in this case that Choice "fraudulently induced" it to execute the Settlement. In any event, the express terms of the Settlement provided that Madison would immediately pay Choice $35,000 in satisfaction of its past due financial obligations and Choice would waive its claim for the remainder, in excess of $51,000. In addition, the percentage of gross room revenues Madison was obligated to pay in fees under the Agreement was reduced from 5.1% to 5.0%. The Settlement contains a broad release, pursuant to which Madison released as against Choice "all manner of action and actions, suits, debts, sums of money . . . arising from [the Agreement]" up to the date of the Settlement. Finally, the Settlement contained an integration clause providing that the Settlement was "contractual and not a mere recital and contains the full terms of the agreement and may not be changed orally," and it expressly directed that the parties would continue to perform their respective obligations under the Agreement except as modified in the Settlement.

Madison contends, without a scintilla of evidence to support the contention, that Choice persisted in its failure to promote

---

4. In addition to "Clarion Suites," the Clarion line includes Clarion Inns, Clarion Hotels and Clarion Resorts, each with its own particular characteristics and market position. Mani-

festly, the Agreement did not require Choice to promote exclusively or even specifically the "Clarion Suites" brand.

the Clarion Suites brand in a reasonable manner even after the execution of the Settlement and that, indeed, Choice abandoned the Clarion Suites concept, allegedly as evidenced by a decline in the number of such operations around the county. The record is clear, however, that contrary to Madison's belief, the number of Clarion Suites remained roughly constant as an overall percentage of Clarion establishments over the relevant period and that Choice did not abandon the Clarion Suites brand. In fact, between 1995 and 1999, the percentage of Clarion Suites constituting the overall number of Clarion establishments increased slightly.[5]

In the meantime, at some point between 1995 and 1997 Madison became dissatisfied with Choice's performance under the Agreement for two reasons. First, Madison became displeased with Choice's advance registration system. Due to the positioning of the Hotel for long-term guests and due to the registration system's servicing of all hotels within the Choice system (which primarily service short-term guests), the Hotel frequently received advance registrations for short-term guests. The receipt of such reservations produced the counterproductive result that Madison would be forced to oust long-term guests to accommodate reservations of short–term guests furnished by the advance registration system.

Second, Madison grew displeased with Choice's enforcement of standards generally contained in the Agreement and set forth more particularly in Choice's Rules and Regulations. In the Agreement, Madison covenanted to "maintain and operate the ... Hotel as a luxury-class hotel." Agreement, ¶ 5(a). Pursuant to this obligation, Madison was required to "maintain the ... Hotel, all furniture, fixtures and equipment ("FF + E") ... in conformance with the Rules and Regulations ... and to operate the ... Hotel strictly in accordance with the terms and conditions" of the Agreement. *Id.* at ¶ 5(b). Madison also agreed to "keep the ... Hotel at all times in the highest degree of repair ... order and condition, including without limitation such periodic repainting of the exterior and interior of the ... Hotel and related facilities, such maintenance and repairs to all equipment and such refurbishment or replacement of obsolete or outdated FF + E [ (furniture, fixtures and equipment) ] ... as [Choice] may from time to time *reasonably* direct." *Id.* at ¶ 5(b)(1) (emphasis added). Finally, Madison agreed to "refurbish the ... Hotel periodically (but no less frequently than once every 5 years) upon [Choice's] *reasonable* request including ... remodeling and redecorating of the interior and exterior of all buildings and related facilities at the ... Hotel, and such repair and/or replacement of existing FF + E ... as may be necessary to reflect the ... public image required by [Choice]...." *Id.* at 5(b)(2) (emphasis added).

Madison provides four instances in which it believes Choice acted unreasonably in its enforcement of standards. First, Madison believes that Choice acted unreasonably when Madison was charged

---

**5.** According to the January 23, 1990 Uniform Franchise Offering Circular generated by Choice and received by Madison on April 6, 1990, there were 36 Clarion establishments operating nationwide. None of these establishments operated as Clarion Suites. According to the January 9, 1995 Uniform Franchise Offering Circular generated by Choice, there were 62 Clarion establishments operating nationwide. Only seven of these establishments operated as Clarion Suites. According to Choice business records presented by Madison, as of January 13, 1999, there were 102 Clarion establishments operating nationwide. Thirteen of these establishments operated as Clarion Suites. Over the a ten year period, the number of Clarion Suites has remained, according to these benchmarks, roughly constant as a percentage of total Clarion establishments. That is, in 1995, the number of Clarion Suites establishments constituted 11.3% (7/62) of the total number of Clarion establishments and in 1999 the number of Clarion Suites establishments constituted 12.7% (13/102). These numbers establish that Choice did not abandon the Clarion Suites brand as Madison alleges.

with deficiencies due to non-compliant draperies installed by Madison. Choice was unreasonable in this instance, Madison believes, because Madison had purchased the draperies from Choice and had recently installed them.

Second, Madison believes Choice acted unreasonably when Madison was charged with a deficiency for "lack of curb appeal." Choice was unreasonable in this instance because the Hotel had not been charged with such a deficiency earlier when "curb appeal" was noted but no points were deducted on the inspection report.

Third, Madison believes Choice acted unreasonably when Madison was charged with a deficiency for including non-required amenities—extra televisions—in rooms of the Hotel but failing to provide remote controllers.

Finally, in October 1997, Madison believes Choice acted unreasonably by requiring the installation of keyless entryways to rooms of the Hotel. Choice was unreasonable in this instance, Madison believes, because the installation of such keyless entryways was prohibitively expensive at the time, was inappropriate for the residential condominiums contained in the Hotel, and was "highly questionable under state building and fire codes." Ingram Aff., ¶ 16.[6]

In a "Quality Assurance Review" of the Hotel conducted by Stan Murphy of Choice in the fall of 1997, the Hotel had failed in the category of "Maintenance and Capital Improvements." In the course of discussions of the review, the Hotel Manager pointed out to Murphy that the claimed maintenance and capital improvement deficiencies would cost several hundred thousand dollars to rectify. According to the Manager, Murphy responded "in essence, that nothing less than an expenditure of 'about one million and a half dollars' would enable the ... [Hotel] to satisfy Choice or achieve a passing score." Further, when the manager "pointed out" that the benefits Madison was receiving from Choice did not justify such capital expenditures, he *interpreted* Murphy's response as a *suggestion* that Choice desired to terminate its arrangement with Madison and end the affiliation.

Based on the Hotel Manager's report of his *interpretation* of Murphy's statement, Madison concluded that "there was nothing practical that [it] could do to satisfy Choice or remain affiliated with Choice," and, mindful both of the alleged circumstances surrounding the Settlement and the belief that Choice had abandoned the Clarion Suites brand, Madison concluded that Choice was acting in bad faith to make it look as if Madison had terminated the contract.

It is undisputed that Madison made no attempt to discuss the matter further with Murphy and made no further attempt to contact anyone else at Choice. Madison ceased paying all fees in November 1997.

Pursuant to provisions in the Agreement, *see* Agreement, ¶ 3(c)(2), Choice sent a letter to Madison on January 5, 1998, notifying Madison of its obligation to cure Madison's failure to pay the outstanding franchise fees. When Madison was not forthcoming, Choice sent a second letter, on February 18, 1998, giving notice pursuant to paragraph 3(c)(3) of the Agreement that it was terminating the franchise relationship. Madison did not respond.

IV

A

Madison's principal explanation of the legal theory underlying its defense seems

---

**6.** In 1996, in order to come into compliance with Massachusetts fire and building codes, the Hotel was obligated to spend $92,316.50 to install an updated firefighters' protection system required for all buildings over seven stories. Because of this unexpected cost, Madison communicated to Choice that it could not afford to install the keyless entryways when requested to do so. Apparently, the Hotel did not have a fire sprinkler system installed, either. This was communicated to Stan Murphy as well.

to place primary reliance on a form of anticipatory repudiation. *See* Defs.' Opp. Mot. Summ. Judg. at 7 (citing, but not discussing, *String v. Steven Dev. Corp.,* 269 Md. 569, 307 A.2d 713, 717 (1973)). This defense excuses one party to a contract from its performance obligations upon an unequivocal act of repudiation of the contract by the other party. *See, e.g., Friedman v. Katzner,* 139 Md. 195, 114 A. 884, 886–87 (1921)("[W]hen in anticipation of the time of performance one definitely and specifically refuses to do something which he is obligated to do, so that it amounts to a refusal to go on with the contract, it may be treated as a breach by anticipation, and the other party may, at his election, treat the contract as abandoned, and act accordingly. This principle is well settled...."); *C.W. Blomquist & Co. v. Capital Area Realty Investors,* 270 Md. 486, 311 A.2d 787 (1973)(stating that a breach may be anticipatory in nature if, prior to the time of performance, one definitely and specifically refuses to do something which it is obligated to do).

■ While the theory of anticipatory repudiation may be generally available as the default rule, "when the language of a contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed." *State Highway Admin. v. Greiner Eng'g Sciences,* 83 Md.App. 621, 577 A.2d 363, 371 (1990)(quoting *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 492 A.2d 1306 (1985)). Here, and conspicuously avoided by Madison, the Agreement expressly provides that if Madison wished to terminate the Agreement, it could do so "at its option and without further demands or notices." *See* Agreement, ¶ 3(f). Under this provision, Madison was empowered to immediately declare the Agreement canceled and terminated if, "after thirty (30) days written notice from [Madison] ..., [Choice] has failed to cure a violation of any provision, covenant, condition or agreement herein contained or contained in the Rules and

Regulations...." *Id.* Upon such termination the Agreement provided that "the breaching party (whether [Choice] or [Madison]) shall be liable to the other party for such damages suffered as a result of such violation." *Id.* at ¶ 3(e). The terms of the contract unambiguously communicate, moreover, that the purpose of the notice clause was to provide Choice an opportunity to cure any noticed default. *See* Agreement, ¶ 3(f). Thus, as a matter of law, Madison relinquished, under the express terms of the Agreement, any right to withhold from Choice written notification of a breach. Anticipatory breach is therefore unavailable to Madison as it failed to provide to Choice any opportunity to cure a default "perceived" by Madison.

Madison's second line of defense seems to place reliance on the rule of law which reads a duty of good faith into certain contracts. *See Food Fair Stores, Inc. v. Blumberg,* 234 Md. 521, 200 A.2d 166 (1964); *Parker v. Columbia Bank,* 366, 91 Md.App. 346, 604 A.2d 521, *cert. denied,* 327 Md. 524, 610 A.2d 796 (1992). As with the defense of anticipatory breach, however, by advancing this argument, Madison attempts to draw attention away from the express terms of the Agreement. Here, and again conspicuously avoided by Madison, each of the provisions relevant to Madison's good faith defense requires Choice to exercise the discretion with which it is invested reasonably. *See id.* at ¶¶ 5(b)(2)-(3)(requiring Choice to reasonably direct or request improvements); *id.* at ¶ 4(b) (requiring Choice to reasonably exercise its discretion in promoting and advertising the Clarion mark).

■ Since the duty of good faith has been expressly incorporated in the Agreement by the parties' expression of the term "reasonably" to qualify Choice's exercise of its discretion, an independent defense of breaching the implied duty of good faith is unavailable to Madison. *See Columbia Bank,* 604 A.2d at 530 ("[T]his duty simply prohibits one party to a contract from acting in such a manner as to

prevent the other party from performing his obligations under the contract.... Thus, the duty of good faith merely obligates a [party] to exercise good faith in performing its contractual obligations; it does not obligate a [party] to take affirmative actions that the [party] is clearly not required to take under [the agreement]."); *Food Fair*, 200 A.2d at 173 (addressing the effect of the implied duty of good faith and fair dealing upon the lease agreement and stating that the duty of good faith implied in leases and contracts imposes a reasonableness standard on the exercise of discretion where the standard is silent); *State Highway Admin.*, 577 A.2d at 371 ("When the language of a contract is plain ... a court must presume that the parties meant what they expressed.").

The foregoing provisions, rather than the default doctrines of anticipatory repudiation and the implied covenant of good faith argued by Madison, govern the resolution of this dispute.[7]

**B**

Turning to the application of the terms of the Agreement to the facts satisfactorily supported by competent evidence, when Choice cited the Hotel for deficiencies relating to the installation of draperies or keyless entryways, or the provision of additional room amenities, Madison was obligated to give notice to Choice that it believed Choice was in breach of paragraph 5(b)(1) Agreement. *See* Agreement, ¶ 5(b)(1) (providing that Choice reasonably direct maintenance and repairs to all equipment and such refurbishment or replacement of obsolete or outdated furniture fixtures and equipment)(emphasis added). Madison did not do so, however, electing instead to accumulate a growing collection of alleged and "perceived" deficiencies in performance by Choice.

Likewise, when Choice cited the Hotel for deficiencies relating to "lack of curb appeal" and other capital and maintenance deficiencies, Madison was obligated to give notice to Choice that it believed Choice was in breach of paragraph 5(b)(2) of the Agreement. *See id.* at ¶ 5(b)(2)(providing that Choice *reasonably* request refurbishing, remodeling and redecorating of the interior and exterior of the Hotel as may be necessary to reflect Choice's public image)(emphasis added). The same duty obligated Madison, whenever it came to believe that Choice had breached its duty to exercise its discretion reasonably in advertising and promoting the Clarion Suites brand, to give Choice written notice of this perceived default. *See id.* at ¶ 4(b) (requiring that Choice reasonably exercise its discretion to market the Clarion brand).

Manifestly, and candidly admitted by Ingram on deposition, Madison failed to give Choice notice with regard to any of these issues. *See* Ingram Dep. at 76–77.[8] Be-

---

7. Even assuming that the theory of anticipatory repudiation would be available to Madison, Madison cannot point to any unequivocal act of repudiation on the part of Choice. At best, the statement made by Murphy in a sarcastic tone to the effect that Madison would have to "spend about a million and a half dollars" in addition to other statements which Madison took to *suggest*-the Hotel Manager's' word-that Choice wished to force Madison out of the Agreement, were equivocal. This expression by Choice's representative, even in the creative mind of Madison's representative, does not express the kind of definite and specific refusal to perform that is required to invoke the doctrine of anticipatory repudiation. *See Friedman*, 114 A. at 886–87.

8. In pertinent part, the excerpt reads:

Q: Was there a particular reason [to explain Madison's refusal to pay franchise fees]?
INGRAM: Yes.
Q: What was the reason?
INGRAM: We believed that-we were told that no matter what we did, in other words, we weren't going to be able to-we weren't going to stay in this franchise. They were going to terminate us.
Q: Did you have *any conversation with anyone else* [other than Stan Murphy] at Choice, aside-not anyone else. Did you have *any conversations with anyone at Choice yourself with respect to that issue?*
INGRAM: *No,* Choice has never tried to contact us directly.
Q: I understand. But when you heard from Mr. Rodrigues that, according to him,

yond the Hotel Manager's "point[ing] out to Mr. Murphy that many of the claimed maintenance and capital improvement 'deficiencies' would cost several hundred thousand dollars to rectify," Madison did nothing to cast upon Choice its duty to cure alleged breaches of the Agreement. In the absence of Madison's exercise of its option to terminate the Agreement by giving notice, it remained bound. *See id.* at ¶ 3(a) ("This Agreement *shall* ... terminate on the 20th anniversary of the date of commencement of operations ... *unless terminated in accordance with the provisions hereof.*") (emphasis added).

■ Since it is undisputed by the parties that Madison ceased making franchise payments in November 1997, Madison fell into breach and Choice was within its rights to cancel the contract and sue on its terms. *See id.* at ¶ 3(c)(2) (providing that Choice notify Madison of intent to terminate for failure to pay franchise fees); *id.* at ¶ 3(e) (providing that breaching party "shall be liable to the other party for such damages suffered").

## C

Madison's final theory of defense to this action, like the two defenses previously discussed, attempts to draw further attention away from the Agreement. Madison claims that it was fraudulently induced into entering into the Settlement and thereby bypass its option to exercise its right to opt out of the Agreement on the first no cause opt out date, June 17, 1990.

■ The basis of the alleged fraud, Madison contends, is alleged specific public representations made by Choice to the effect that Choice intended to mount a program to actively promote and advertise the Clarion Suites brand as part of the Settlement negotiations. The full extent of

Madison's evidence on this point is as follows:

> Importantly, as an integral part of the 1995 renegotiation and settlement agreement, Choice made specific representations (and indeed publicly announced to all of its franchisees) that it intended to mount a program of brand specific advertising and marketing and to actively promote the 'Clarion Suites' brand and reverse the trend of the perceived 'phase out' of that particular brand.

Ingram Aff., ¶ 8. I have stricken this entire paragraph from the record. Even if I had not, however, the statement, unsupported by further documentation, does not relate the extent of these representations, nor when, where, by whom and to whom they were made. It provides no indication of other franchisees to whom these representations were made neither the form nor the specific context of the public announcement is indicated in the affidavit. Without more, this statement is insufficient to generate a genuine issue of material fact as to whether material misrepresentations regarding Choice's future advertising of the Clarion Suites brand were made. *See* Fed.R.Civ.P. 9(b); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir.1999).

In addition to the absence of any issue of fact regarding whether a misrepresentation was made, the proposition of fraud itself is dubious. The Settlement negotiations concluded with Choice waving $51,509.23 out of a total of $86,509.23 in franchise fees. *See* Settlement, ¶ 2. Madison's franchise fee rate was reduced by from 5.1% to 5.0% of gross room revenues. In exchange, Madison released Choice from "all manner of action" arising out of the Agreement up to the date of the Settlement. *See id.* at ¶ 4. The Settlement did not, as Madison attempts to suggest, limit any of Madison's rights under the original Agreement. *See id.* at ¶ (providing that the obligations set forth in the Agreement shall survive the Settlement). Madison

---

Stan Murphy had said that there was going to be a termination, essentially that was inevitable, *did you or anyone else,* aside from Mr. Rodrigues, *call up anyone else at*

*Choice* aside from Mr. Murphy, *and attempt to discuss the issue?*
INGRAM: *No ....*

was free, therefore, to exercise its right to terminate the Agreement when it believed Choice had violated its provisions.[9]

### D

Thus, as a matter of law, defendants' ostensible defenses in this breach of contract action fail. Madison seriously misapprehends its burden in this case. The burden is not on Choice to show that it did not breach the Agreement (by showing that it acted reasonably in the evaluations of the Hotel and in its performance of its other duties). Rather, the burden of proof is on Madison to show that a reasonable juror could conclude by a preponderance of the evidence that Choice, after having received written notice of alleged defaults in those respects, continued to act unreasonably in carrying out its responsibilities.

Madison has no documents, no correspondence, no expert evidence and no admissions by Choice to support its burden. It has only its undocumented unilateral beliefs and opinion that Choice acted unreasonably. And, it makes no pretense that Choice received written notice of default. Accordingly, defendants' liability has been established here as a matter of law. I shall turn then to the issue of damages.

### V

Choice claims two categories of damages. First, it claims a total of $44,140.15 in unpaid fees through September 15, 1999. There is no dispute of material fact as to its entitlement to such damages. Ac-

cordingly, an interlocutory judgment shall be entered for that amount.

Choice also claims lost profits damages in an amount exceeding $137,000. Although Madison has done little to challenge the correctness of that calculation, I agree with its contention that it has provided sufficient legal argument to generate an issue of fact as to such damages, and thus it is entitled to have a jury assess Choice's evidence of loss of profits damages. Accordingly, a jury trial on such damages shall be promptly scheduled.

---

**9.** *See Calomiris v. Woods,* 353 Md. 425, 727 A.2d 358, 368 (1999):

> It is a "fundamental principle" of the Maryland law of contracts that it is "improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships...." Contracts play a critical role in allocating the risks and benefits of our economy, and courts generally should not disturb an unambiguous allocation of those

risks in order to avoid adverse consequences for one party. In the absence of fraud, duress, mistake, or some countervailing public policy, courts should enforce the terms of unambiguous written contracts without regard to the consequences of that enforcement. Thus, as noted above, the court has no choice but "to presume that the parties meant what they expressed," and it may not look to "what the parties thought that the agreement meant or intended it to mean." (citations omitted).